Mary A. HOHE, et al., Plaintiffs,

v.

Robert P. CASEY, Governor, et
al., Defendants.

Civ. A. No. 88–1348.

United States District Court,
M.D. Pennsylvania.

Sept. 15, 1988.

Milton L. Chappell, Raymond J. LaJeunesse, Jr., Glenn M. Taubman, Nat. Right to Work Legal Defense Foundation, Inc., Springfield, Va., and Thomas A. Beckley, John G. Milakovic, Charles O. Beckley, II, Beckley & Madden, Harrisburg, Pa., for plaintiffs.

Thomas York, and Joseph S. Sabadish, Deputy Attys. Gen., Harrisburg, Pa., for Casey, Zazyczny, Greene & Com. of Pa.

Elaine Williams, Kirschner, Walters & Willig, Philadelphia, Pa., and John J. Sullivan, Richard Kirschner, Larry P. Weinberg, Kirschner, Weinberg & Dempsey, Washington, D.C., for Council 13, American Federation of State, County & Mun. Employees.

## MEMORANDUM

CALDWELL, District Judge.

### Introduction

Through this action the plaintiffs present a constitutional challenge to Act No. 84 of 1988 which amended Pennsylvania's Administrative Code of 1929, 71 P.S. §§ 51–732 (Purdon 1962 and Supp.1988), to allow labor unions to collect "fair share fees" from certain non-union Commonwealth employees. Pending for disposition is the plaintiffs' motion for a preliminary injunction in which they challenge the procedure utilized by the defendants to deduct the fee from their paychecks. At issue presently are the technical aspects of the implementation of the fee collection program and not the constitutionality of Act 84 or the fair share fee concept. As explained below, the plaintiffs' preliminary injunction motion will be denied and the temporary restraining order currently in effect will be lifted.

### Background

On July 13, 1988, Act 84 amended Pennsylvania's Administrative Code to authorize labor unions to bargain for and collect a "fair share fee" from certain non-union Commonwealth employees, in order to off-set the cost of collective bargaining on behalf of said non-members. On July 28, 1988, AFSCME Council 13 and the Commonwealth amended their collective bargaining agreement to provide for the deduction of such fees from the paychecks of the plaintiffs and other non-members who are represented by the Union for collective bargaining purposes. Council 13 determined the non-members' fair share fee to be equal to 88.55% of the members' regular dues. Based on the union dues rate of 1.5% of base salary, the fair share fee was calculated to be 1.33% of a non-member's base salary. The Union determined the identities of the non-member fee payers from the Commonwealth's payroll records and informed the Commonwealth of the names and amounts to be deducted.

The Union prepared a notice to be sent to the non-member fee payers to explain how the fair share fee was calculated. The notice, dated August 8, 1988, lists the Union's audited expenses, broken down by major expense category, for the fiscal year that ended on June 30, 1987. Each category contains an allocation of chargeable and nonchargeable expenses and the notice contains a description of what expenses the Union considers to be chargeable and nonchargeable. It advises the fee payers of their rights to object to payment of the fee on religious grounds or to challenge the fee calculation itself within 45 days. When challenges are made, an impartial decisionmaker is to be appointed by the American Arbitration Association to conduct a hearing. At that hearing, Council 13 will have the burden of proof regarding the amount of the fair share fee and the accuracy of the underlying calculation of chargeable expenses. Upon receipt of a challenge, the Union is to deposit in an interest bearing escrow account 100% of the fair share fee paid by the challenger. The fee will remain in escrow until resolution of the challenge by the decisionmaker, and will then be distributed according to the ruling.

Between August 8 and August 12, 1988, the Union mailed notices to approximately 18,000 non-members. On August 16, 1988, the Commonwealth began deducting fair

share fees. Pursuant to the collective bargaining agreement, the Commonwealth is to remit to Council 13 membership dues and fair share fees withheld in one month by the end of the following month. Accordingly, the fair share fees deducted in August are to be transferred to the Union by September 30, 1988. Pursuant to past practice, the Commonwealth will not remit the funds until on or about September 26, 1988.

On August 26, 1988, the 15 plaintiffs, Commonwealth employees who work in bargaining units represented by AFSCME Council 13, filed this lawsuit. The plaintiffs are not members of Council 13 and claim the Union and the Commonwealth have violated their first and fourteenth amendment rights by exacting the fair share fees. Also on August 26, 1988, the plaintiffs filed a motion for a temporary restraining order and a preliminary injunction, through which they challenge the constitutional adequacy of the procedure the defendants used to implement the fair share fee program. On August 30, 1988, the court restrained further fair share fee deductions pending a hearing on the preliminary injunction motion. Said hearing was conducted on September 9, 1988, and the plaintiffs' motion for preliminary injunction is now ripe for disposition.

*Discussion*

For a court to grant a request for a preliminary injunction:

the moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other

interested persons from the grant or denial of the injunction, and (4) the public interest."

*In re Arthur Treacher's Franchise Litigation,* 689 F.2d 1137, 1143 (3d Cir.1982) (quoting *Oburn v. Shapp,* 521 F.2d 142, 147 (3d Cir.1975)). Unless both probability of success and irreparable harm are demonstrated, preliminary injunctive relief is not to be granted. *Id.* (Citing *Kershner v. Mazurkiewicz,* 670 F.2d 440, 443 (3d Cir. 1982) (en banc)).

The only issues to be decided presently concern the procedural adequacy of the technical aspects of the Union's program and the notice sent to the plaintiffs. The question of the constitutionality of Act 84 or of fair share fee programs in general is not now before the court.[1] However, it is worthy of note that although fair share fee programs impinge upon first amendment rights, it is clear that with proper procedural safeguards, they are constitutional. *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed. 2d 232 (1986); *Ellis v. Railway Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984); *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Such programs must, however, "minimize the risk that nonunion employees' contributions might be used for impermissible purposes." *Hudson,* 475 U.S. at 309, 106 S.Ct. at 1077, 89 L.Ed.2d at 248. The Supreme Court wrote in *Hudson* that:

"[T]he objective must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities." *Abood,* 431 U.S., at 237, 97 S.Ct. at 1800.

---

**1.** It goes without saying that from a social or political standpoint, the advisability of fair share fee programs is not a matter to be determined, or even addressed, by the court. The court is aware of, and understands, the plaintiffs' philosophical objections to fair share fee programs. However, their remedy for those concerns lies in the legislature, and the Pennsylvania General Assembly apparently has determined that a fair share fee program is in the best interest of the people of the Commonwealth and, accordingly, enacted Act 84. Absent a violation of the law or the Constitution, the court is without authority to overrule the state legislature on public policy matters.

Procedural safeguards are necessary to achieve this objective for two reasons. First, although the government interest in labor peace is strong enough to support an "agency shop" notwithstanding its limited infringement on nonunion employees' constitutional rights, the fact that those rights are protected by the First Amendment requires that the procedure be carefully tailored to minimize the infringement. Second, the nonunion employee—the individual whose First Amendment rights are being affected—must have a fair opportunity to identify the impact of the governmental action on his interests and to assert a meritorious First Amendment claim.

Id. 475 U.S. at 302–03, 106 S.Ct. at 1074, 89 L.Ed.2d at 244–45 (footnotes omitted).

The court's analysis of the procedural safeguards for the protection of the plaintiffs' first amendment rights begins with the Supreme Court's decision in *Hudson*.[2] The question in *Hudson*, as in the case at bar, was whether the procedure used by the Union adequately protected the plaintiffs' "constitutional right to 'prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative.'" *Id.* at 301–02, 106 S.Ct. at 1073, 89 L.Ed.2d at 244 (quoting *Abood v. Detroit Board of Education*, 431 U.S. 209, 237, 97 S.Ct. 1782, 1800, 52 L.Ed.2d 261, 285 (1977)). The Court held that "the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* 475 U.S. at 310, 106 S.Ct. at 1078, 89 L.Ed.2d at 249. The plaintiffs allege defects in the defendants' fair share fee program only with re-spect to the first and last of those requirements.

■ From the evidence adduced at the hearing in this matter, it is clear that the Union's program complies with the escrow requirement. Upon receipt of an objection, 100% of the objector's fair share fee is segregated and placed in escrow until the objection is ruled upon by the arbitrator. That aspect of the plan goes beyond the requirements of the *Hudson* decision, in which the Court wrote that a 100% escrow is not mandatory because it would create "the serious defect of depriving the Union of access to some escrowed funds that it is unquestionably entitled to retain." *Hudson*, 475 U.S. at 310, 106 S.Ct. at 1077–78, 89 L.Ed.2d at 249.

The plaintiffs' contentions that, even absent an objection, the Union must escrow all funds immediately upon receipt and that failure to do so amounts to the receipt of an involuntary loan are without merit. *Hudson* imposes no such requirement. The Supreme Court was clear in its pronouncement that the non-union employee has the burden of objection. The Union need not foresee objections and set aside the money in anticipation. The plaintiffs have proffered no sound reason for such a requirement and have directed the court to no cases imposing such a restriction. In fact, in *Tierney v. City of Toledo*, 824 F.2d 1497 (6th Cir.1987), a case heavily relied upon by the plaintiffs, the court expressly approved an escrow plan similar to the one at hand.

The plaintiffs' challenge to the Union's escrow arrangement in effect asks the court to supplement *Hudson's* procedural requirements with others that are not warranted under the facts of this case. Their arguments are aimed not at proving non-compliance with the strictures of *Hudson*, but at criticizing the balance between first amendment and Union interests struck in *Hudson*. That criticism necessarily falls

---

**2.** As in *Hudson*, the court will analyze the constitutionality of the Union's fee collection procedure from the perspective of first amendment concerns because "in this context, the procedures required by the First Amendment also provide the protections necessary for any deprivation of property." *Hudson*, 475 U.S. at 304 n. 13, 106 S.Ct. at 1075 n. 13, 89 L.Ed.2d at 245 n. 13.

on deaf ears since this court is without the power to change that balance.

The plaintiffs next contend that the defendants' fair share fee program is constitutionally infirm because it does not "include an adequate explanation of the basis for the fee" as required by *Hudson*. Specifically they assert that the Union has provided no financial information about AFSCME's affiliated unions. They also argue that the notice shows that Council 13 pays *per capita* taxes to AFSCME International, the Pennsylvania AFL–CIO and "Central Labor Councils," yet no financial data is provided for the latter two groups, and an inadequate disclosure is provided for AFSCME International.

▪ In an effort to meet the plaintiffs' objections, the Union has determined that it would not charge fair share fee payers for the AFL–CIO and Central Labor Councils *per capita* taxes and has recalculated the fee.[3] The court finds that procedure to be satisfactory and, in effect, it moots the plaintiffs' objection to the *per capita* expenses.

▪ After carefully examining the notice, the court finds the financial information for AFSCME International, (Schedule 5), to be sufficient under *Hudson*. The notice sets forth each of the International Union's departments' expenses and designates each as chargeable or non-chargeable. Schedule 5, as supplemented by the notice's explanation of what constitute chargeable and nonchargeable expenses, adequately informs the plaintiffs of the bases for their share of the AFSCME International *per capita* tax and enables them to make intelligent objections. Though additional information may be desired, all that *Hudson* requires is that "potential objectors be given sufficient information to gauge the propriety of the union's fee." *Hudson* 475 U.S. at 306, 106 S.Ct. at 1076, 89 L.Ed.2d at 247. That has been done here.

▪ A more difficult question arises with respect to Council 13 payments to affiliated local unions. The Union notice does not present the same type of information concerning local unions as it does for Council 13 itself. Instead, it provides as follows:

> AFSCME Council 13 has approximately 300 affiliated local unions. In accordance with the decisions of the federal courts AFSCME Council 13 has assumed in its calculations of the fair share fee that the percentage of the expenses of these local unions which are chargeable to fair share fee payers is at least as great as the percentage of chargeable expenses of AFSCME Council 13.

The plaintiffs assert that such a presumption is insufficient under *Hudson* and *Tierney* which, they argue, require that detailed financial information be provided for each affiliate that receives money from the Union.

The court notes that the only reference in *Hudson* to the adequacy of financial information for affiliate unions is found in a footnote that provides as follows:

> We continue to recognize that there are practical reasons why "[a]bsolute precision" in the calculation of the charge to nonmembers cannot be "expected or required." *Railway Clerks v. Allen*, 373 US, [113] at 122, 83 SCt 1158, [at 1163] 10 LEd2d 235 [1963], quoted in *Abood*, 431 US, at 239–240, n 40, 97 SCt 1782, 52 LEd2d 261. Thus, for instance, the Union cannot be faulted for calculating its fee on the basis of its expenses during the preceding year. The Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor. With respect to an item such as the Union's payment of $2,167,000 to it affiliated state and national labor organizations, ... for instance, either a showing that none of it was used to subsidize activities for which nonmembers may not be charged, or an explanation of the share that was so used was surely required.

**3.** The reduced fee amounts to 1.29% of the non- members' base salaries.

*Hudson,* 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18, 89 L.Ed.2d at 247 n. 18. In discussing what information was required to be disclosed to fair share fee payers, the Court of Appeals for the Sixth Circuit interpreted footnote 18 as requiring that "[s]uch disclosure must include an audited, detailed accounting of local union payments to affiliated state and national labor organizations that will be used for agreement and non-agreement related purposes." *Tierney,* 824 F.2d at 1503.

The Union argues that it has provided for a detailed accounting of affiliate expenses by applying the presumption quoted above, and cites the following cases as supporting the vitality of such a presumption: *Lowary v. Lexington Board of Education,* No. C86–1536A (N.D.Ohio March 3, 1988); *Gillespie v. Willard Board of Education,* No. C87–7043 (N.D.Ohio Sept. 28, 1987); *Andrews v. Education Association of Cheshire,* 653 F.Supp. 1373 (D.Conn. 1987), *aff'd* 829 F.2d 335 (2d Cir.1987); and *Robinson v. New Jersey,* 547 F.Supp. 1297 (D.N.J.1982), *rev'd on other grounds,* 741 F.2d 598 (3d Cir.1984). The court finds the logic used by those courts to be sound and will follow the course laid by those cases.

■ *Hudson* does not require that each local expenditure be audited. *Gillespie.* As the *Andrews* court wrote:

> There is little basis for the conclusion that every document made part of every disclosure process employed by every union is to be subjected to an independent audit, regardless of the size of the union and the circumstances under which is operates.... [W]hen considering the disclosure provisions of the plan as a whole, this court cannot find, on the basis of one clause of one sentence of one footnote in *Hudson,* that the failure to provide an audit of the explanatory memorandum itself, or the failure to require

an independent audit for the [local unions'] expenditures, renders the proposed system constitutionally deficient.

*Andrews,* 653 F.Supp. at 1377. This court agrees with that assessment.

*Lowary, Gillespie* and *Andrews* found presumptions similar to that in the case at bar to be permissible. In *Andrews,* the court wrote that such a presumption "is necessary to avoid the potentially prohibitive cost of having to prove the individual percentages of nearly one hundred [local unions]," *Andrews,* 653 F.Supp. at 1377, and held that the "use of the evidentiary presumption that the statewide figure is appropriate for the locals satisfies constitutional requirements, even if in rare instances there may arise situations in which this presumption is incorrect." *Id.* at 1378.[4]

The court finds the utilization of the presumption in this case to be reasonable and constitutionally acceptable. However the court echoes the concerns of the *Lowary* court that it has before it no evidence that the local unions' expenditures parallel those of Council 13.[5] During the hearing, the Union did not come forward with evidence to prove that the presumption is founded in fact. However, the court finds it unnecessary to rule on the factual accuracy of the presumption in order to validate its use in the Union notice. As stated earlier, the purpose of the notice is to enable dissatisfied non-union members to form a basis for their objections to the amount of their fair share fees. The notice here is adequate for that purpose and whether it is in fact accurate is irrelevant to that determination. A dissenting non-member is entitled to object to the presumption and the Union will bear the burden of proving to the impartial decisionmaker that it is founded in fact.

■ The plaintiffs next argue that the Union's notice is inadequate because the

---

**4.** The issue of the use of the presumption was not raised on appeal. *Andrews v. Education Ass'n of Cheshire,* 829 F.2d 335, 338 n. 1 (2d Cir.1987).

**5.** Apparently the *Gillespie* and *Andrews* courts similarly lacked such evidence. The basis for the presumption in those cases was dicta in

*Robinson* that the local associations are less likely to engage in as extensive political activities as a state or national organization and thus the monies expended on those types of expenses would be less. However, the courts did not address any evidentiary concerns.

financial information is not audited or verified. The plaintiffs do not dispute that independent auditors have verified that the dollar amounts listed in the notice were actually spent on the items represented. Instead, they contend that the auditors did not verify which part of the expenditures were chargeable to non-members and which parts were not.

The plaintiff's position is without merit. The Court of Appeals considered and rejected a similar argument in *Andrews* and wrote:

> Appellants' claim that *Hudson* requires that both the union's expenditures and its allocation of expenses to chargeable and nonchargeable categories be audited turns on an interpretation of the purpose of an audit. Appellants' approach to this problem would have the auditor making a legal, not an accounting, decision regarding the appropriateness of the allocation of expenses to the chargeable and nonchargeable categories. We believe, however, that *Hudson's* auditor requirement is only designed to ensure that the usual function of an auditor is fulfilled. That usual function is to ensure that the expenditures which the union claims it made for certain expenses were actually made for those expenses. The union's plan satisfies this requirement. The appellants' interpretation of *Hudson's* auditing requirement is overly broad because it seeks to have the auditor function both as an auditor in the traditional sense and as the independent decisionmaker as to chargeable expenses.

*Andrews*, 829 F.2d at 340 (footnote omitted). The same result was reached in *Lowary* and *Gillespie*.

■ The plaintiffs also argue that the Union's notice is defective because it was untimely. Citing *Tierney v. City of Toledo*, 824 F.2d 1497 (6th Cir.1987), *Gilpin v. AFSCME*, 643 F.Supp. 733 (C.D.Ill.1986), and *Lehnert v. Ferris Faculty Association*, 643 F.Supp. 1306 (W.D.Mich.1986), the plaintiffs contend that notice and financial information must be provided sufficiently in advance of the agency fee payroll deductions to enable them to make an intelligent decision whether to object to the amount of the deduction. The plaintiffs urge the court to adopt a thirty-day notice period as the constitutionally required minimum.

Under the facts of the case at bar, the court finds little support in the cases cited by the plaintiffs for requiring a thirty day hiatus between receipt of the notice and deduction of the fee. In *Tierney*, the Court of Appeals for the Sixth Circuit simply said that "*Hudson* admonishes the union to give 'potential objectors ... sufficient information to gauge the propriety of the union's fee,' before it collects any fees from non-members." *Tierney*, 824 F.2d at 1503 (citation omitted). That was done here. The *Gilpin* court declined to establish an arbitrary period of notice and held that "adequate notice requires notification a sufficient time prior to the deprivation so as not to present the deprived party with a *fait accompli*.... Once the Union informs management of its desire to assess 'fair share' fees in a specified amount, those against whom the fees will be assessed should also be notified of their right to object." *Gilpin*, 643 F.Supp. at 737–38. That also was done in this case. Finally, the *Lehnert* court wrote:

> In the spirit of *Hudson*, I think it constitutionally required that nonmembers have *at least* two weeks after receipt of "adequate information about the basis for the proportionate share" in which to consider the information and make a reasoned decision whether to object. Furthermore, in order to assure that a dissenter's funds are not temporarily used for objectionable purposes, I hold alternatively that Ferris may not withhold agency funds from nonmembers' checks until after the time for objection has passed *or* that the union must place said funds in an independently controlled, interest bearing escrow account for said time period.

*Lehnert*, 643 F.Supp. at 1332–33.

The court finds the approach adopted by the *Lehnert* court to be sound. That approach is consistent with *Hudson's* admoni-

tion that the Union's procedure must avoid the risk that non-members' funds would be used, even temporarily, to finance ideological activities unrelated to collective bargaining. In the present case, the Union will not have access to the fair share fees until after the 45–day period for objecting has expired. Thus there is no chance of impermissible use during that period. Furthermore, once objections are filed, the funds will be escrowed and, again, the Union will not have them at its disposal. Therefore, the notice afforded the plaintiffs in this case was timely from a constitutional perspective.[6]

In the plaintiffs' final objections they raise substantive challenges to the amount of the fee. Such claims are more properly considered by the impartial decisionmaker and will not be ruled upon by the court. The plaintiffs are free to raise them under the arbitration procedure outlined in the defendants' notice.

*Conclusion*

After carefully reviewing the procedure implemented by the defendants to effectuate the collection of fair share fees, the court concludes that it comports with the constitutional requirements set forth in *Hudson* and its progeny. Accordingly, the court will deny the plaintiff's motion for a preliminary injunction, and will lift the temporary restraining order. An appropriate order will issue.

ORDER

AND NOW, this 15th day of September, 1988, after hearing the plaintiffs' motion for a preliminary injunction, it is ordered that:

1. The plaintiffs' motion is denied.

2. The temporary restraining order issued on August 30, 1988, is lifted and the Commonwealth of Pennsylvania may withhold and remit to AFSCME Council

---

6. At the hearing, the plaintiffs presented evidence that some of their number did not receive a copy of the Union's notice. Given the size of the mailing, that is not surprising. The fact that

---

13 the fair share fees, computed at a rate of 1.29%, retroactive to August 16, 1988.

a very small number of non-members did not receive notice does not render the Union's procedure constitutionally defective.