**Dennis GWIRTZ, et al., Plaintiffs,**

v.

**OHIO EDUCATION ASSOCIATION, Defendant.**

**No. C87–3476A.**

United States District Court, N.D. Ohio, E.D.

Nov. 18, 1988.

James A. Calhoun, James R. Stokes, Calhoun, Benzin, Kademenos & Heichel, Mansfield, Ohio, Glenn M. Taubman, Rossie D. Alston, Jr., Nat. Right to Work Legal Defense Foundation, Springfield, Va., for plaintiffs.

Ira Mirkin, Green, Haines, Sgambati, Murphy & Macala, Youngstown, Ohio, John A. Daily, Daily & Condrea, Akron, Ohio, for defendant.

## MEMORANDUM OPINION

DOWD, District Judge.

### I. INTRODUCTION.

This is an action brought by the plaintiffs against the defendants for alleged violations of first amendment rights as a result of the defendant's collection of fair share fees under a public employment collective bargaining agreement. The parties agree that the dispute and issues presented in this case have been resolved by the Court's review of the Ohio Education Association's ("OEA") fair share fee plan in *Lowary v. Lexington Teachers Association*, 704 F.Supp. 1456 ("*Lowary* II").

*See* docket # 34. However, the one remaining issue not raised in *Lowary* but raised in this case is whether the type of financial disclosure provided by the defendant is sufficient under *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986).

The Court conducted a hearing on April 29, 1988 for the purpose of hearing testimony on the disclosure issue. The parties have since supplied the Court with post hearing memorandum and the Court is now in a position to rule on the remaining issue. For the reasons that appear below, the Court finds that the OEA's financial disclosure is adequate under the applicable case law.

## II. BACKGROUND.

As a matter of introduction, the basic issue can be summarized as a dispute over whether one form of disclosure is required rather than another form.

The defendant OEA's financial disclosure is made up of its basic financial statements [1] along with a supplemental schedule setting out the chargeability versus nonchargeability expenses. The OEA's present financial disclosure (Plaintiff's Hearing Exhibit # 3) is referred to by the parties as a Supplemental Schedule presented with the basic statement ("Supplemental Schedule") which is regulated by statement on Auditing Standard No. 29 ("SAS 29"). The plaintiffs' position is that the defendant should be required to disclose its financial information with a "Special Report" or an "Examination on a Special Report" ("Special Report") which is governed by the statement on Auditing Standard No. 14 ("SAS 14").

It is basically undisputed that the level of assurance, and the level of detail is greater on an SAS 14 Special Report as opposed to a SAS 29 Supplemental Schedule. However, it is the defendant's position that the SAS 29 Supplemental Schedule is sufficient and adequate disclosure under *Hudson* and subsequent case law.

The Court heard testimony from the plaintiffs' expert, Professor Hawkins, and the defendant's audit accounting firm representatives regarding the two types of reports. To better understand the testimony, it is important for the Court to define an often used term as it is used by the witness in the context of financial audits. The term "materiality" was defined by the plaintiffs' expert, Professor Hawkins, as "the magnitude that an omission or misstatement in the accounting presentation, that in the light of the circumstances, the judgment[ ] of a reasonable person relying on the accounting presentation would be changed or influenced." Tr. at 41–42. Robert Birzer of Deloitte, Haskins and Sells, a partner from the accounting firm that actually did the audit of the OEA's financial statements, explained what he referred to as "monetary precision" and "materiality" as

> [W]e set a basic monetary precision level to design, upon which we design the extent of our detailed testing. Materiality level is then evaluated upon [sic] conclusion of the audit based on known errors, as well as possible expected errors, and a conclusion is then reached based on those circumstances as to whether any adjustment has to be made to the financial statements.

> The monetary precision factors set a bench mark for which we decide that we want to insure a minimum level of testing based on this amount. Our integrated audit procedures result that we'll consider all items under that level, as well as items that are over that level.

Tr. at 114. While Mr. Birzer stated that "monetary precision" and "materiality" are not the same, the Court finds that Professor Hawkins definition is sufficient and not substantially different from Mr. Birzer.

Turning to the discussion of the testimony, Professor Hawkins' testimony can be summarized as follows: (1) the Supplemental Schedule, while an appropriate method of reporting, is reviewed with the same level of materiality as is the basic financial

---

1. The basic financial statements include the balance sheet, statements of revenue and expenses, and statements of changes in financial position. Plaintiff's Exhibit 3; Tr. at p. 34–35.

statements and is therefore insufficient for an appropriate review of the figures in the Supplemental Schedule (Tr. at 44); (2) the Special Report does not use the same level of materiality as the basic statement, but instead uses a more detailed and lower level of materiality, thus giving a more detailed picture of the subject matter of the Special Report (Tr. at 44); (3) that the Special Reports are often used when organizations want to report on the specific area of concern, e.g., royalties under a music contract; and (4) the sophisticated user would be better serviced by an SAS 14 Special Report, rather than by an SAS 29 Supplemental Schedule.

Professor Hawkins' testimony highlighted the fact that the audit firm of Deloitte, Haskins and Sells used a materiality level of $820,000 on the OEA audit while many of the figures on the supplemental schedule were below that level. The implication, therefore, was that the auditors failed to audit the figures presented by the defendant in the supplemental schedule. Professor Hawkins testified that the materiality level used was simply too high for a detailed examination of the chargeability versus nonchargeability statement supplied in the SAS 29 Supplemental Schedule. Professor Hawkins also opined that the level or scope of audit under a SAS 29 Supplemental Schedule was less intensive than the scope of audit under a Special Report. Tr. at 54–61.

Robert Birzer of Deloitte, Haskins and Sells, a Big Eight accounting firm, performed the audit under consideration and was called on cross examination by plaintiffs at the hearing. Mr. Birzer testified that while the level of materiality was indeed $820,000, that the audit did not simply ignore figures below the level of materiality. Tr. p. 122; 159–61. Mr. Birzer also testified that the level of materiality is not disclosed to the client and is instead estab-

lished by the auditor in order to maintain the integrity of the audit. Tr. at 157–58. Mr. Birzer testified that the use of a SAS 29 Supplemental Schedule is appropriate and often used for reporting special items such as material required by the Securities & Exchange Commission, the National Association of Securities Dealers, Regulations Broker Dealers, Federal Home Loan Bank Board, and the Department of Housing and Urban Development. Tr. at 150. Mr. Birzer also testified that the SAS 29 Supplemental Schedule is produced after the basic financial statements are subjected to a detailed audit examination. Accordingly, and in response to Professor Hawkins' claims, the SAS 29 Supplemental Schedule does in fact undergo an independent audit.

Based upon testimony at the hearing, the Court makes the following findings of fact: (1) in accordance with standard auditing procedures the basic financial statements are presented along with the SAS 29 Supplemental Schedule or SAS 14 Special Report; (2) the level of materiality used by auditors under a SAS 14 Special Report is generally lower than that used on an SAS 29 Supplemental Schedule; (3) the statements and auditing standards do not require either SAS 29 Supplemental Schedule or SAS 14 Special Report to be used as a matter of rule; (4) the SAS 29 Supplemental Schedule is a proper reporting mechanism for special subject matters such as the matter in this case as is the Special Report; and (5) under a Supplemental Schedule presented with the basic statement, the Supplemental Schedule is subjected to an independent audit because the basic financial statements from which the Supplemental Schedule is derived, was subjected to detailed testing.[2]

### III. DISCUSSION.

The crux of plaintiffs' argument is that the defendant is under an obligation to

---

**2.** The plaintiffs argue that because eleven of the sixteen categories presented on the Supplemental Schedule were not subject to detailed testing, there was no independent verification by the auditor of the Supplemental Schedule. However, it was the testimony of the auditors that the schedule was derived from the detailed test-ing of the financial statements themselves and that there was indirectly an independent analysis of whether the expenditures were actually made. See, e.g. Tr. at 124. Moreover, the auditors did supplemental checking on certain OEA accounts. Tr. at 125.

apply the least restrictive means available to it for collecting the fair share fees of the plaintiffs and as a part of that less restrictive means, the Union is under an obligation to effectively, fairly, and accurately explain the basis for the agency fee calculations. To that end, the plaintiffs argue that the SAS 14 Special Report, is the most effective means of explaining the agency fee calculations. In sum, the plaintiffs' argument is that the SAS 14 Special Report should be used as opposed to the SAS 29 Supplemental Schedule. The defendant, on the other hand, argues that the SAS 29 Supplemental Schedule is sufficient and adequate under *Hudson*.

■ The purpose of the financial disclosure in the fair share fee process, prior to the nonmembers' opportunity to object, is to provide the nonmember with sufficient information so that user can make an informed decision whether to object or not. *Chicago Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292, 306, 106 S.Ct. 1066, 1075–76, 89 L.Ed.2d 232 (1986). Furthermore, this Court stated in *Lowary, II*, 704 F.Supp. 1456 that "[i]t is the Union's position on what is chargeable that is important to a nonmember and not the position of an independent auditor. The nonmember, therefore, can make an informed decision as whether to object." *Id.* at 1462. The question, therefore, is whether the type of financial disclosure at issue provides the nonmember with "sufficient information to gauge the propriety of the union's fee." *Hudson*, 475 U.S. at 306, 106 S.Ct. at 1076.

In the Court's view, there are two extremes regarding whether there has been an adequate financial disclosure. On the one hand, as the Supreme Court stated, "[l]eaving the nonunion employees in the dark about the source of figure for the agency fee—and requiring them to object in order to receive information—does not adequately protect the careful distinctions drawn in *Abood*." *Hudson*, 106 S.Ct. at 1076 (footnote omitted). On the other

hand, "[t]he Union need not provide nonmembers with an exhaustive detailed list of all of its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor." *Id.* at n. 18.

■ In this case, the Court finds that the defendant's type of financial disclosure here, strikes a balance between the extremes and adequately discloses the financial position of the Union. The defendants' present financial disclosure, includes: (1) the audited basic financial statement of the union, including the supplemental schedule (approx. 14 pages); (2) the OEA's 1987–1988 budget (approx. 41 pages); the audited budget of the National Education Association (approx. 41 pages); the North Central Ohio Education Association expenditure report (1 page); and the Lexington Teachers Association (Richland) expenditure report (1 page).[3] The users of the material in this case are education professionals with post-high school degrees and can fairly assess whether they want to object or not on the basis of the information disclosed to them. The user of this information is not, therefore, without sufficient basis to evaluate this material in terms of a decision whether to object to the fair share fee collection.

The plaintiffs would have the Court endorse a system that requires greater detail so that the user could be better informed. The plaintiffs argue that as it stands now the information provided can not be understood but by a very small percentage of the users. Tr. at 28–29. At the same time, the plaintiffs' expert admitted that the use of the SAS 14 Special Report would be of no more help in terms of increasing the number of those who understood the information. *Id.* However, the plaintiffs' witness opined that by providing a better or more detailed Special Report the user can be assured that the report is sufficient if the user fails to take heed of the report. *Id.* That rationale comes very close to the plaintiffs' early argument in *Lowary* that it

---

**3.** See the affidavit of Jon A. Ziegler, General Counsel of the OEA, docket # 159 in *Lowary*, C86–1536A, and exhibits B, C, D and E, and

plaintiff's hearing exhibit 3 in the above-captioned case.

is the role of the independent auditor to make an initial determination of chargeability versus nonchargeability, one which was not accepted by the Court in the latest *Lowary* decision. The auditor's role under *Hudson* and the subsequent cases is not to provide a level of reliance or assurance on the chargeability decision as the plaintiffs would wish, but rather the role is to verify the statements of the Union. Therefore, it is the user who must determine whether he or she wishes to object.

The plaintiffs argue that the Court is required to order the least restrictive means available for the Union to disclose its finances and in this case the means is the SAS 14 Special Report. The Court disagrees and instead agrees with the Second Circuit in *Andrews v. Education Association of Cheshire*, 829 F.2d 335 (2d Cir. 1987), where the Second Circuit stated that

> We do not believe that *Hudson* stands for the proposition that a union's procedures are constitutionally infirm unless they constitute the least restrictive process imaginable. When the union's plan satisfies standards established by *Hudson*, the plaintiffs should be upheld even if its opponents can put forth some plausible alternative less restrictive of their right not to be coerced to contribute funds to support political activities that they do not wish to support.

*Andrews*, 829 F.2d at 340.

In this case, the Court finds that while the SAS 14 Special Report may be a more detailed auditing report it is any less restrictive than the SAS 29 Supplemental Schedule. The plaintiffs are merely attempting to narrow the focus and require the Court, and ultimately the judicial system, to mandate the specific conduct of the defendant. As an example, not only do the plaintiffs request that the Court order the use of a SAS 14 Special Report by the defendant, the plaintiffs also request that the Court order a litany of other requirements to be imposed upon the Union in its financial disclosure including: (1) that the Union use a very low level of materiality (the plaintiff, however, does not offer the Court a specific level to use); (2) that the Union perform "detailed audit testing on each major agency fee chargeability calculation;" (3) that the Union provide a detailed description of the programs and activities covered by each major expense category; (4) that the Union provide more detailed notes to its financial statements; (5) that the Union "provide a clear explanation as to what the auditor's opinion truly means and what the auditor's testing procedures actually entail;" (6) that the Union "provide a detailed description of the nature of the internal records maintained by the Unions to prove the validity of the chargeability calculations;" and (7) that the Union provide a clear "indication as to which parts of the financial disclosure on the Union's communications, and which parts are the auditors." Plaintiffs' Post-Hearing Brief (docket # 49) at pp. 25–26. Moreover, the plaintiffs include that the Court should consider the appointment of an accounting expert as a Special Master for the purpose of temporarily overseeing the Union's engagement of their auditors. *See* footnote 9, p. 27 of docket # 49 Post Hearing Brief. The Court declines to take the intrusive action requested by the plaintiffs.

## IV. CONCLUSION.

For the reasons that appear above, the Court finds that the type of financial disclosure provided by the defendant under its current fair share fee plan is adequate under *Hudson* and subsequent cases. Accordingly, the Court declines to provide the relief requested by the plaintiffs.

In view of the parties' representation that all the issues in this case are resolved by the Court in *Lowary* II (*see* C86–1536A, docket # 34) and the Court's decision on the accounting issue in this opinion, the Court finds that all issues in *Gwirtz v. Ohio Education Association* are hereby resolved. The Court, therefore, finds that judgment shall be entered in favor of the defendant and against the plaintiffs in the above-captioned case.

IT IS SO ORDERED.