Mary A. HOHE, et al., Plaintiffs,

v.

Robert P. CASEY, Governor, et al., Defendants.

Civ. A. No. 88–1348.

United States District Court,
M.D. Pennsylvania.

Dec. 11, 1989.

Milton L. Chappell, Raymond J. LaJeunesse, Jr. and Glenn M. Taubman, Nat. Right to Work Legal Defense Foundation, Inc., Springfield, Va., and Thomas A. Beckley, John G. Milakovic and Charles O. Beckley, II, Beckley & Madden, Harrisburg, Pa., for plaintiffs.

Thomas York, Deputy Atty. Gen., Harrisburg, Pa., and Joseph S. Sabadish, Deputy Atty. Gen., for Casey, Zazyczny, Greene and Com. of Pa.

Elaine Williams, Kirschner, Walters & Willig, Philadelphia, Pa., and John J. Sullivan, Richard Kirschner and Larry P. Weinberg, Kirschner, Weinberg & Dempsey, Washington, D.C., for Council 13, American Federation of State, County & Mun. Employees.

MEMORANDUM

CALDWELL, District Judge.

## I. *Introduction*

By memorandum and order, dated August 10, 1989, we decided that section 2 of Act No. 84 of 1988, amending the Pennsylvania Administrative Code of 1929, 71 P.S. §§ 51, 732–506 (Purdon 1962 & Purdon Supp.1989), and the collective bargaining agreement executed pursuant thereto, were constitutional for the most part under *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). Act 84 authorized labor unions representing Commonwealth employees to collect a fair share fee from state workers who were not members of the union for the unions' costs of representing these nonmembers in collective bargaining. In our memorandum, we noted that the only issue to be resolved was whether, in accordance with *Hudson*, the major categories of expenses in the August 1988 fair share fee notice had been subjected to "verification by an independent auditor." *Hudson*, 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18, 89 L.Ed.2d at 247 n. 18. A hearing was held for that purpose on September 8, 1989, and the parties also entered into a stipulation. They subsequently briefed the issue and the matter is ready for disposition.[1]

## II. *Background*

Greater detail on all aspects of this case can be found in our previous memoranda. *See* 704 F.Supp. 581 (M.D.Pa.1988) (granting plaintiffs a temporary restraining order against collection of the fee); 695 F.Supp. 814 (M.D.Pa.1988) (vacating the restraining order and denying plaintiffs' motion for a preliminary injunction), *aff'd*, 868 F.2d 69 (3d Cir.1989); 128 F.R.D. 68 (M.D.Pa.1989) (class action certification). For our purposes it is only necessary to note the following.

---

1. This is a class action in which Mary A. Hohe, among others, is a representative plaintiff for nonmembers of the union. The defendants are, among others, the Commonwealth of Pennsylvania, Robert P. Casey, the Governor of the Commonwealth, and Council 13, American Federation of State, County and Municipal Employees (AFSCME Council 13). The state union is, as its name implies, affiliated with American Federation of State, County and Municipal Employees, AFL–CIO (AFSCME International).

The August 1988 fair share fee notice was based upon the audits of the basic financial statements of both AFSCME International and AFSCME Council 13 and the Supplementary Financial Information accompanying the financial statements. The audits of the financial statements for AFSCME International, the statements for the fiscal year ending December 31, 1987, and AFSCME Council 13, the statements for the fiscal year ending June 30, 1987, were conducted in accordance with generally accepted auditing standards. The audits of the Supplementary Financial Information, examining the major categories of expenses for the unions, were performed pursuant to Standard Auditing Statement ("SAS") No. 29. The auditor's report accompanying the Supplementary Financial Information for AFSCME International contained the following statement:

> The accompanying supplementary financial information, appearing at pages 8 and 9, is presented for purposes of additional analysis and is not a required part of the basic financial statements. Such information has been subjected to the auditing procedures applied in the examinations of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the financial statements, taken as a whole.

(Joint Exhibit 1).

The auditors issued the same opinion in connection with the Supplementary Financial Information for AFSCME Council 13 (Joint Exhibit 3).

In connection with calculating chargeable and nonchargeable expenses, the auditors prepared Special Reports pursuant to SAS No. 35. The Special Report for AFSCME Council 13 was prepared on July 20, 1988, prior to the issuance of the notice. The Special Report for AFSCME International was prepared after the notice was sent to nonmembers.

Witnesses at the hearing testified to the significance of these accounting procedures. Professor Martin Benis, a certified public accountant, testified on behalf of the unions. He gave a basic overview of the auditing process. The process includes ten generally accepted auditing standards, composed of three major categories: (1) general standards; (2) standards of field work; and (3) standards of reporting. As highlighted by Professor Benis, the first category deals with the technical proficiency of the auditor and the due care to be exercised in performing the audit. The second category seeks to obtain "sufficient competent evidential matter." (N.T. 12). This would be accomplished "through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under examination." (*See* "Generally Accepted Auditing Standards," defendants' Exhibit 1). The third category contains standards of reporting dealing with the contents of the auditor's report and whether an opinion can or cannot be expressed regarding the financial statements taken as a whole. (defendants' Exhibit 1). When an auditor states that an audit was performed in accordance with generally accepted auditing standards, he is referring to these standards.

In regard to SAS No. 29, the witness stated that, when the auditor expresses an opinion, the second and third standards of field work apply,[2] but these standards do not apply when a special report is prepared pursuant to SAS No. 35. Professor Benis explained that, along with the three general standards, only the first standard of field work applied to SAS No. 35. The second and third standards of field work, as already noted, are part of the process of obtaining "sufficient competent evidential matter." The plaintiff's expert, Dr. David F. Hawkins, confirmed this function of the second and third standards with understandably more emphasis upon their role as "search and verification procedures." (N.T. 74).

### III. *Discussion*

■ We must decide whether the foregoing accounting work on the unions' ex-

**2.** Joint Exhibit 13 at paragraph 10 indicates that additionally the general standards, all the standards of field work, and the third and fourth standards of reporting would apply.

penses met the Supreme Court's requirement in *Hudson, supra,* that the major categories of expenses be subject to "verification by an independent auditor." In doing so, we accept the plaintiffs' definition of this phrase. The verification must be what an accountant would do when undertaking an audit. The accountant must be able to opine that the information supplied is fairly stated in all material respects. It is in this sense that we accept the statement of the Second Circuit in *Andrews v. Education Association,* 829 F.2d 335, 340 (2d Cir.1987):

> *Hudson's* auditor requirement is only designed to ensure that the usual function of an auditor is fulfilled, that usual function is to insure that the expenditures which the union claims it made for certain expenses were actually made for those expenses.

It is thus apparent that the breakdown of chargeable and non-chargeable expenses found in the Special Reports prepared in accordance with SAS No. 35 were not subjected to verification by an independent auditor as required by *Hudson.* Only the first standard of field work applies to these Reports and it requires only that the work be adequately planned and assistants be properly supervised. There is no evaluation of the client's internal controls or an investigation which would enable the auditor to render an opinion. It is not surprising then, that the Special Reports issued for the breakdown of the unions' expenses into chargeable and non-chargeable items contain the following language:

> We have applied certain agreed-upon procedures to the schedules with respect to the allocation of expenses as between amounts chargeable and non-chargeable to agency fee payers for the [relevant fiscal year]. Our procedures included the following:
>
> (a) We reviewed the underlying assumptions for reasonableness.
>
> (b) We tested the allocations for mathematical accuracy.
>
> Because the foregoing procedures do not constitute an examination made in accordance with generally accepted auditing standards, we do not express an opinion on any such allocations. However, nothing came to our attention that caused us to believe that the allocations should be adjusted. Had we performed additional procedures, matters might have come to our attention that would have been reported to you.

(Joint Exhibits 3 and 4) (brackets added).

The financial figures for various categories were supplied in three columns. The first column was headed "Total Expenses," the next column "Chargeable Expenses," and the third column "Nonchargeable Expenses." Significantly, the auditors did express an opinion concerning the Total Expenses:

> The information appearing under the column headings "total expenses" has been subjected to the auditing procedures applied in the examination of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements, taken as a whole.

(Joint Exhibits 3 and 4).

We are therefore not persuaded by defendants' argument, buttressed by the testimony of the accountant who actually performed the audits, that because the basic financial statements and Supplementary Financial Information were audited, the accuracy of the Special Reports must be accepted. The level of materiality related only to the figures in the total expense column. The auditors refused to express an opinion on any further breakdown of these figures. It is irrelevant that the auditors may have used the "generally accepted auditing principles set forth in SAS 35," (defendants' brief at p. 7), if those principles did not permit the auditors to verify the breakdown. Defendants' reliance upon *Gwirtz v. Ohio Education Ass'n,* 704 F.Supp. 1481 (N.D.Ohio 1988), *aff'd,* 887 F.2d 678 (6th Cir.1989), is misplaced. In *Gwirtz,* the union had audited the breakdown of chargeable and non-chargeable expenses under SAS No. 29 standards. The breakdown in the instant case was pursuant to SAS No. 35 standards.

The defendants' argument is also somewhat contradictory. They contend that the Special Reports did verify the expenses if verification is defined as "a confirmation or certification by the auditor with regard to the essential truth or accuracy of the information which is being presented." (defendants' brief at p. 11). But, as noted, the Special Reports did not do that. The auditors specifically disclaimed any opinion on the breakdown of chargeable and nonchargeable costs and stated that, if they had performed other procedures, the outcome might have been different. This is not verification under the unions' own definition.

▌ The defendants further argue that the Supreme Court in *Hudson* meant verification to mean an examination of the basic financial statements under generally accepted auditing standards appropriate under the circumstances. (*See* defendants' brief at p. 13). We disagree. The Court in *Hudson* did not say that an audit of the basic financial statements would be sufficient. The whole point of providing the notice of nonmembers was to give them enough information to decide whether to challenge the fair share fee. That would require a breakdown between chargeable and nonchargeable costs. The Supreme Court has said that the necessary disclosure must include verification by an independent auditor. Hence, it must have meant verification of the breakdown. Verification of the basic financial statements occurs too early in the process to be of help. It would not provide any reassurance concerning the allocation of costs and enable a nonmember to decide whether to contest the fee or not. The following language from *Hudson* supports our position although it deals directly with the escrow issue:

> We need not hold, however, that a 100% escrow is constitutionally required. Such a remedy has the serious defect of depriving the Union of access to some escrowed funds that it is unquestionably entitled to retain. If, for example, *the original disclosure by the Union had*

*included a certified public accountant's verified breakdown of expenditures,* including some categories that no dissenter could reasonably challenge, there would be no reason to escrow the portion of the nonmember's fees that would be represented by those categories.

475 U.S. at 310, 106 S.Ct. at 1077–78, 89 L.Ed.2d at 249 (emphasis added).

Footnote 23 contains the following language:

> If the Union chooses to escrow less than the entire amount, however, it must carefully justify the limited escrow on the basis of the independent audit, and the escrow figure must itself be independently verified.

*Id.,* 475 U.S. at 310–11 n. 23, 106 S.Ct. at 1078 n. 23, 89 L.Ed.2d at 249 n. 23.

The Court could therefore not have intended the independent audit to stop at the basic financial statements. *See generally, Tierney v. City of Toledo,* 824 F.2d 1497 (6th Cir.1987). *But see Andrews v. City of Cheshire,* 829 F.2d 335 (2d Cir.1987) (unaudited memorandum describing chargeable and non-chargeable expenses sufficient under *Hudson* when derived from audited basic financial statements).

Our approach does not require "'absolute precision' in the calculation of the charge to nonmembers...." *Hudson,* 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18, 89 L.Ed.2d at 247 n. 18 (quoted case omitted). The audit, as plaintiffs recognize, need only be conducted in accordance with generally accepted auditing standards sufficient for the auditor to be able to form an opinion that the financial information is fairly stated in all material respects. This does not require the auditor to go through every invoice, receipt or financial document but only to obtain sufficient evidential material upon which to form an opinion.

▌ Having found a violation of plaintiffs' first amendment rights in the unions' *Hudson* procedure, we must determine an appropriate remedy.[3] Plaintiffs would

---

**3.** We would also note that *Hudson* was violated

because AFSCME International's Special Re-

have us order full restitution of the fees obtained under the improper audit. They cite *Hudson; Robinson v. New Jersey,* 806 F.2d 442 (3d Cir.1986); *Lowary v. Lexington Local Board of Education,* 854 F.2d 131 (6th Cir.1988) and *Gibney v. Toledo Board of Education,* 40 Ohio St.3d 152, 532 N.E.2d 1300 (1988) in their support. They have also cited the Third Circuit affirmance of our denial of plaintiffs' motion for a preliminary injunction. *See* 868 F.2d 69.

None of these cases require us to order full restitution in the circumstances of this action. We are not required to follow *Gibney. Hudson* and *Hohe* left the issue of a remedy to the district court, *Hohe* specifically stating that the "plaintiffs' remedy, should they succeed on the merits, will consist of restitution *and/or* monetary damages." 868 F.2d at 73 (emphasis added). The court in *Hohe* emphasized "that the standard remedy for violation of 42 U.S.C. § 1983 is compensatory damages." *Id.* n. 6 (citing *Carey v. Piphus, infra.*). *Lowary* is distinguishable. Following remand the district court in *Lowary,* stated the following when confronted by the same argument we face here:

> The plaintiffs seek reconsideration of the Court's portion of the March 2, 1988 order ("*Lowary II*") wherein the Court declined to award a complete restitution of all the agency fees collected as a result of the 1985–1986 and 1986–1987 academic years. The plaintiffs' motion is based upon the Sixth Circuit's decision in *Lowary v. Lexington Local Board of Education,* 854 F.2d 131 (1988)....

> The Court finds that the plaintiff's reliance on *Lowary,* 854 F.2d 131 is misplaced. The Sixth Circuit's review was limited to whether the escrow of fair share fees collected in view of the Court's preliminary holding that it was

likely that the procedures in place violated *Hudson* was permissible. The Sixth Circuit simply concluded that the escrow was not permissible. The focus in *Lowary,* 854 F.2d 131, therefore, was not on the remedy phase once a fair share fee plan has been determined to be unconstitutional. The Court remains committed to its award of relief under the March 2, 1988 order, *Lowary II,* and finds that the plaintiffs' motion for reconsideration is not well taken.

*Lowary v. Lexington Local Board of Education,* 704 F.Supp. 1476, 1480–81 (N.D. Ohio 1988).

The reference to *Lowary II* was to the district court's opinion at 704 F.Supp. 1456, 1470 (N.D.Ohio 1988), where the court found that the nonmembers were only entitled to "a return of all monies determined to be noncharageable by the impartial decisionmaker" who was responsible for arbitrating the accuracy of the fair share fee allocation. The court also included interest on those sums and nominal damages of $1.00 for each plaintiff for the unconstitutional procedures used to allocate and obtain their fair share fees.

We believe that the approach of the district court in *Lowary* is the way we should proceed here. *See also Hudson v. Chicago Teachers Union,* 117 F.R.D. 413 (N.D.Ill. 1987). Accordingly, plaintiffs are entitled to an award of nominal damages of $1.00 apiece because they have established that constitutionally inadequate procedures were used in imposing the fair share fee. It is unclear, however, whether plaintiffs are further entitled to a partial rebate. The defect was only in the failure to verify the union's figures with an independent audit. The figures may indeed be accurate in which case plaintiffs are not entitled to a refund[4] and, as stated, only nominal dam-

---

ports were prepared after the notices to the nonmembers were sent. Hence, that portion of the fair share fee based upon the International's costs were not verified in any manner at the pertinent time, prior to the issuance of the notices.

**4.** This is a problem only for the 1988–89 fair share fee. The breakdowns for 1989–90 were

subjected to sufficient audits, ones conducted under SAS No. 62. Those audits enabled the auditors to render opinions that "the schedule of expenses ... presents fairly, in all material respects, the expenses of [the unions] ... and the allocation between chargeable and nonchargeable expenses, on the basis of the significant factors and assumptions described in Note 3. (Joint Exhibits 10 and 11) (brackets added).

ages would be appropriate. *See Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). We will accordingly grant leave to the unions to submit audits, among other evidence they may want to file, of the pertinent financial documents to show that the fair share fee was sufficiently verified. Plaintiffs may respond with their own evidence.

We will issue an appropriate order.