Steven H. PRESCOTT, et al., Plaintiffs,

v.

COUNTY OF EL DORADO,
et al., Defendants.

No. Civ. S–95–1859 LKK/JFM.

United States District Court,
E.D. California.

Feb. 22, 1996.

Dain Weiner, Cameron Park, CA, W. James Young, National Right to Work Legal Defense Foundation, Inc., Springfield, VA, for plaintiffs.

Fred J. Hiestand, Sacramento, CA, Michael W. Roman, Berkeley, CA, for defendants.

## ORDER

KARLTON, Chief Judge, Emeritus.

Pending before the court is the plaintiffs' motion for a preliminary injunction. Oral argument was heard on January 16, 1996, and the matter was taken under submission. The court disposes of the matter herein.

## I.

### FACTS [1]

Plaintiffs are Public employees of the County of El Dorado. In early 1995, the County entered into a collective bargaining agreement ("CBA") with the El Dorado County Employees Association, Local # 1 ("EDCEA" or "the union"). The CBA between EDCEA and the County establishes an "agency shop" under which all employees of the bargaining unit must either maintain membership in the union or pay a "fair share" agency fee as a condition of employment with the County.

EDCEA is one of forty affiliates of the Professional Employees Union, Local # 1 ("PEU") which represent employees of local public agencies, cities, counties and special districts. EDCEA has 570 members and there are an additional 114 fee payers; PEU has over 9100 total members and an additional 482 fee payers. All dues from the ED-CEA are paid to PEU.

In April 1995, EDCEA forwarded to the nonmembers a notice informing them that the County would begin to deduct a "fair share fee" from their paychecks equaling 98% of the full union dues.[2] The notice

1. The facts relevant to resolution of the motion are largely undisputed. The recitation in the text is drawn from the moving and opposition papers, and particularly from Exhibits B(4), B(5) and B(6) to the complaint. Because these facts are found in connection with plaintiffs' motion for a preliminary injunction, they are subject to revision after trial.

2. The union first collects the entire fee from all employees and then places 2% of that fee in an interest bearing escrow account. Any employee

explains that the union uses the fair share fee to defray the costs incurred by it for both individual and group representation with regard to employment relations with the County, and claims that the actual costs for non-chargeable expenditures are less than 2%.

Enclosed with the notice is a schedule of PEU's projected expenditures for the 1995 fiscal year, based upon expenditures for the 1994 fiscal year. The schedule identifies the major categories of expenses and places an asterisk next to those categories which the union deems as "non-representational expenditures." These non-representational categories are denominated: (1) "ideological expenditures," (2) "social events, gifts, and donations," (3) "contributions to political education fund," and (4) "blood bank." The notice further explains that "[f]air share fees do not include any expenses incurred for political action, social activities or organizing expenses. Organizing expenses are those incurred to bring new bargaining units into representation by public employees union, Local # 1."

The notice also includes a statement of PEU's revenues and expenses for the 1994 fiscal year. This document lists the major categories of expenses and indicates whether they were paid from the general operating fund or the political education fund. According to the 1994 statement, only "contribution expenses" and "bank charges" were payed by the political education fund; "contribution for political education" and "social events, gifts etc." came from the general fund.

Finally, a letter from a CPA is attached to the notice. It reports that the 1994 statement was "reviewed" in accordance with standards established by the American Institute of Certified Public Accountants, and that it conformed with "generally accepted accounting principles."

The notice explains that if a nonmember challenges the fee, the union will set aside an additional 2% of his or her fair share fee in an interest-bearing escrow account.[3] Under the original notice nothing further occurs until ninety days after the end of the fiscal year, when the union publishes a statement of the year's income and general expenditures.

A nonmember dissatisfied with the fee may challenge it in writing within thirty days after publication of the fiscal year end report. The nonmember's challenge is resolved by an arbitrator selected in accordance with procedures established by the American Arbitration Association or the state conciliation and mediation service.

The nonmembers were told that the procedure for challenging the amount of the fair share fee required the dissenting nonmember to submit a letter to the PEU, signed under penalty of perjury, stating the specific expenditure or expenditures, from the list of projected expenditures, believed not to be chargeable as a fair share fee. Subsequent to the filing of this suit, the requirement that the dissenting nonmember specify the category objected to and make the objection under penalty of perjury was eliminated.[4]

The County began deducting the agency fees on May 12, 1995. Plaintiffs filed this lawsuit on October 10, 1995. They note that the notice to the nonmembers fails to provide an audited financial disclosure of the local

who then objects to paying the full fee receives an immediate "advanced reduction" consisting of the 2% placed in escrow and a 2% reduction of the full fee every month thereafter.

3. In other words, the dissenting nonmember has 4% of his or her total dues placed into an escrow account and then receives an advance reduction of half that amount (i.e. 2% of the total dues). *See* Declaration of Henry L. Clarke, attached to defendant's Opposition, at ¶ 8.

4. The nonmembers were sent a memo concerning the change in procedure which reads in pertinent part:

Public Employees Union, Local One's policy provides for a 30–day challenge period and does not require that challenges be made "under penalty of perjury.... All fair share fee payers are hereby informed that they have 30 days from the receipt of this notice to challenge in writing the fees assessments for 1995. Fair share fee payers should know that there is no requirement that they make challenges specify [sic] what expenditure is being challenged, but reasonable identification of the expenditure being challenged will enable the Public Employees Union to better respond to such challenge....

*See* January 10, 1996 Memorandum to Agency Fee Payers.

union's chargeable versus nonchargeable allocations and fails to provide audited financial disclosure of the breakdown of chargeable versus nonchargeable expenditures of each affiliated labor organization that receives money from the EDCEA. They also assert that the notice fails to assure nonmembers that the union will not use their dues to support nonchargeable expenses, and imposes burdensome procedures for challenging the fee. In light of these asserted deficiencies, they claim that the procedures used by the union to collect the fees violate the nonmembers' rights under the First and Fourteenth Amendments to the Constitution of the United States. Plaintiffs seek a preliminary injunction restraining the County and the union from collecting any fees from plaintiffs, or otherwise enforcing the agency shop arrangement, until a constitutionally adequate notice has been provided and constitutionally adequate procedures are in place and operating.

## II.

### PRELIMINARY INJUNCTION STANDARDS UNDER FED.R.CIV.P. 65

The purpose of a prohibitory preliminary injunction is to preserve the relative positions of the parties—the status quo—until a full trial on the merits can be conducted. *See University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). The limited record usually available on such motions renders a final decision on the merits inappropriate. *See Brown v. Chote,* 411 U.S. 452, 456, 93 S.Ct. 1732, 1735, 36 L.Ed.2d 420 (1973).

■ "The [Supreme] Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Speculative injury, however, does not constitute irreparable injury. *Goldie's Bookstore, Inc. v. Superior Court of State of California,* 739 F.2d 466, 472 (9th Cir.1984).

■ In the Ninth Circuit, two interrelated tests exist for determining the propriety of the issuance of a preliminary injunction. The moving party carries the burden of proof on each element of either test. *See Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1203 (9th Cir.1980).

■ Under the first "traditional" test, the court may not issue a preliminary injunction unless each of the following requirements is satisfied: (1) the moving party has demonstrated a likelihood of success on the merits, (2) the moving party will suffer irreparable injury and has no adequate remedy at law if injunctive relief is not granted, (3) in balancing the equities, the nonmoving party will not be harmed more than the moving party is helped by the injunction, and (4) granting the injunction is in the public interest. *See Martin v. International Olympic Committee,* 740 F.2d 670, 674–75 (9th Cir.1984).

■ Under the second "alternative" test, the court may not issue a preliminary injunction unless the moving party demonstrates "either a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor." The Ninth Circuit has explained that the two parts of the alternative test are not separate and unrelated, but are "extremes of a single continuum." *Benda v. Grand Lodge of Intern. Ass'n of Machinists and Aerospace Workers,* 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). We are taught that the critical element within this alternative test is the relative hardship to the parties. *See Id.* Even if the balance tips sharply in favor of the moving party, however, it must be shown at an "irreducible minimum" that there is a "fair chance of success" on the merits. *International Olympic Committee,* 740 F.2d at 674–75.

■ In exercising their sound discretion, courts should pay particular regard to public consequences in granting an injunction. *Weinberger,* 456 U.S. at 312, 102 S.Ct. at 1803.

## III.

## LIKELIHOOD OF SUCCESS ON THE MERITS

The likelihood of plaintiffs' success depends on the substantive law. Below, I briefly examine the origins of the legal doctrine underlying plaintiffs' action and then turn to their specific claims.

### A. The Doctrine of Unwilling Allegiance

In *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Supreme Court held that requiring nonunion employees to support their collective-bargaining representative "has an impact upon their First Amendment interests.... But ... such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop" to the creation of labor peace. *Id.* at 222, 97 S.Ct. at 1793. Accordingly, the court held that the constitution is no impediment to unions achieving recognition as the exclusive collective-bargaining representative of public employees, nor to the concomitant obligation of nonunion employees, as a condition of employment, paying a service fee to defray the costs of union activities which bear on the collective bargaining contract. *Chicago Teachers Union, Local No. 1, AFL–CIO v. Hudson*, 475 U.S. 292, 298,

106 S.Ct. 1066, 1071, 89 L.Ed.2d 232 (1986). The court has also held, however, that the First Amendment stands as a bar to such unions collecting money from nonmembers to be expended on political and ideological causes with which the nonmembers disagree and which are said to be unrelated to its duties as collective-bargaining agent. *Id.; Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 516, 111 S.Ct. 1950, 1957, 114 L.Ed.2d 572 (1991).[5]

In *Abood*, the court below found that the union had used the funds of unwilling donors for political purposes. In fashioning a remedy, the Supreme Court noted that while funds could not be collected for purposes infringing on the constitutional rights of the nonmembers, it was improper to restrain collection of that portion of the fee devoted to representational activities of the union. *Abood*, 431 U.S. at 237, 97 S.Ct. at 1800. This holding has led to an elaborate effort to articulate a procedure for permitting collection of representational fees while insuring that there is no collection of fees used for prohibited purposes.[6] To facilitate challenges to the collection process while insuring the benefits of a union shop, three basic requirements have emerged. First, nonmembers must receive information as to the basis of the calculation of their proportionate share, including verification by an independent auditor. *Hudson*, 475 U.S. at

---

5. Once a union shop is established, either dues or fair share contributions to the union are mandated at the peril of loss of a job. If the union then uses some part of those dues for political or ideological purposes not shared by an employee, it is said that the local government is requiring adherence to a particular political view thus giving rise to a violation of the First Amendment. This assessment is hardly without force; nonetheless, the analysis does not appear to this court to fit the conventional pattern of First Amendment issues. Of course the First Amendment is implicated when the government seeks to require adherence to its views. *See, e.g., Wooley v. Maynard*, 430 U.S. 705, 714–715, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977). Here, it is not the government's view that is being fostered, indeed the local government's view may be as divergent from the union's as any dissenters'. Moreover, the impingement on the dissenters' First Amendment rights is indirect, arising out of a contract whose governmental purpose is not to affect the political rights of public employees, but to obtain the services of its employees and insure labor

peace. All restrictions on the First Amendment rights of public employees require a balancing of the right of free speech against the need for an efficient public service. *Pickering v. Bd. of Educ. Of Tp. High School Dist. 205, Will County, Illinois*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). I do not mean to suggest that such a balancing would result in a different result in *Abood*, I only note that no such balancing was undertaken. Since I am clearly bound by *Abood* and its progeny, however, it is acknowledged that such musings have limited value.

6. At first blush it seems remarkable that the elaborate requisites discussed above are seen as compelled by the Constitution. Of course the text of the First Amendment contains no such requirements; nonetheless, the formulation of prophylactic procedures to protect constitutional rights is not without precedent. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

306–07 & n. 18, 106 S.Ct. at 1075–76 & n. 18. Second, the procedures for collecting fees must assure that the union does not use dues paid by nonmembers, even temporarily, for a purpose which does not further the collective bargaining agreement. *Id.* at 306, 106 S.Ct. at 1075; *Ellis v. Brotherhood of Railway Clerks,* 466 U.S. 435, 448, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428 (1984). Third, the union must allow for expeditious review of disputed charges by an impartial decision maker. *Hudson,* 475 U.S. at 307–08, 106 S.Ct. at 1076. I address these three requirements as they relate to the agency shop arrangement at bar.[7]

### B. The Basis for the Fee

■ Under *Hudson,* nonmembers have a right to a fair, prompt and effective procedure for identifying what sums they are required to pay. *Grunwald v. San Bernardino City Unified School Dist.,* 994 F.2d 1370, 1373 (9th Cir.1993), *cert. denied* — U.S. ——, 114 S.Ct. 439, 126 L.Ed.2d 373 (1993). The union must provide "sufficient information to gauge the propriety of the union's fee." *Hudson,* 475 U.S. at 306, 106 S.Ct. at 1076. While the standard is easy to articu-

late abstractly,[8] the precise information required is subject to reasonable dispute. The High Court has said that "[t]he union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor." *Id.* at 307 n. 18, 106 S.Ct. at 1076 n. 18.[9]

In the matter at bar, the union provides nonmembers with a 1994 financial statement and projected 1995 budget outlining the major expense categories and a notice informing them that they are only charged for expenditures "incurred by the union in fulfilling its duty to represent you." The notice also informs the nonmember that all the expenditures for all the major expense categories, except for the political contribution and social events/gifts categories, are incurred only for representational activities fully chargeable to nonmembers.[10] Because the notice "[identifies] the expenditures for collective bargaining and contract administration that had been provided for the benefit of nonmembers ..." it appears to meet *Hudson's* standards. *Hudson,* 475 U.S. at 306–307, 106 S.Ct. at 1075–1076.

---

7. I do not tarry to question why the union must create such procedures when the First Amendment is directed to the activities of the government.

8. *See Laramie v. County of Santa Clara,* 784 F.Supp. 1492, 1497 (N.D.Cal.1992) (union must "provide enough information to nonmembers so that they may understand the charges and then reasonably challenge the basis of the fair share"). *See also Lowary v. Lexington Local Bd. of Educ.,* 903 F.2d 422, 432 (6th Cir.1990) ("The union must provide detailed information so that the dissenting teachers can understand why they are being charged. Only then can they make an informed decision."); *Damiano v. Matish,* 830 F.2d 1363, 1370 (6th Cir.1987) (disclosure must provide nonunion employees with sufficient information so as to enable them to make an intelligent choice).

9. The text of footnote 18 reads as follows:

We continue to recognize that there are practical reasons why "[a]bsolute precision" in the calculation of the charge to nonmembers cannot be "expected or required." [citations omitted]. Thus, for instance, the Union cannot be faulted for calculating its fee on the basis of its expenses during the preceding year. The Union need not provide nonmembers with an

exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor. With respect to an item such as the Union's payment ... to its affiliated state and national labor organizations ... for instance, either a showing that none of it was used to subsidize activities for which nonmembers may not be charged, or an explanation of the share that was so used was "surely required."

*Hudson,* 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18.

10. The notice provides this information in two separate ways. First, the projected budget, which tracks the 1994 financial statement, has an asterisk next to each major expense category which contains non-representational expenditures. Second, the notice explains that nonmembers do not have to pay for expenses "used for partisan political or ideological causes [which include] expenses incurred for political action, social activities or organizing expenses" and states that 2% of the total fee is not chargeable. Since the political contribution and social gift categories equal roughly 2% of the total budget, a nonmember can ascertain that the union deems, rightly or wrongly, each of the other major categories as representational expenditures.

Plaintiffs nevertheless claim that the union's disclosure is inadequate because it does not provide verification that the expenditures which the union claims to be "representational" are in fact "representational" and thereby chargeable to nonmembers. They tender various arguments in support of their position which are considered seriatim below.

### 1. Verification of Allocations

 Relying on two recent district court decisions, plaintiffs contend that an independent auditor must verify the allocation between chargeable and nonchargeable expenditures within each major expense category. *See Mitchell v. Los Angeles Unified School Dist.*, 739 F.Supp. 511, 514–15 (C.D.Cal. 1990); *Hohe v. Casey*, 727 F.Supp. 163, 167 (M.D.Pa.1989), *aff'd in part, vacated in part*, 956 F.2d 399 (3rd Cir.1992). With all due respect, I cannot agree.

Rather than imposing the duty articulated in *Mitchell* and *Hohe*, most cases have explained that the auditor's role is to "ensure that the expenditures which the union claims it made for certain expenses were actually made for those expenses." *See Laramie v. County of Santa Clara*, 784 F.Supp. 1492, 1497 (N.D.Cal.1992), *see also* cases cited at pp. 1497–1498 thereof. Put another way, these cases conclude that the function of the auditor is to verify that expenditures paid for each expense category are actually spent on that category, not to judge whether a particular category is germane to collective bargaining on the one hand or political advocacy on the other. In this respect, the Second, Sixth and Seventh Circuits have specifically repudiated the suggestion that an auditor must verify the determination that an expenditure is for representational activities, reasoning that such an approach would require the auditor to make "a legal, not an accounting, decision regarding the appropriateness of the allocation of expenses to the chargeable and nonchargeable categories." *Andrews v. Education Ass'n of Cheshire*, 829 F.2d 335, 340 (2nd Cir.1987), *cited with approval* in *Laramie*, 784 F.Supp. at 1497–98; *See also Tierney v. City of Toledo*, 824 F.2d 1497, 1505 (6th Cir.1987) (determination of

whether or not an expenditure is for collective bargaining is "an administrative determination by the independent decisionmaker, under the law developing in cases such as *Ellis v. Railway Clerks*, 466 U.S. 435, [104 S.Ct. 1883, 80 L.Ed.2d 428] (1984)."); *Ping v. National Educ. Ass'n*, 870 F.2d 1369, 1374 (7th Cir.1989).

As the Supreme Court's recent *Lehnert* decision demonstrates, the determination of whether an activity is germane to collective bargaining is a difficult legal question dependent upon subtle distinctions and subject to reasonable disagreement among equally competent judges. *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991) (plurality decision with four separate opinions). This fact alone suggests that *Hudson* only requires that auditors verify the total expenditures for each category, rather than make judgments beyond their training and skill.

This reading of *Hudson* follows from the underlying purpose of providing the financial statement to the nonmembers, i.e., to give them sufficient information to determine whether there is a basis for objection to the fee. *Hudson*, 475 U.S. at 306, 106 S.Ct. at 1075. So long as the union provides an auditor's report for the major categories of expenses and indicates that the categories for which it holds nonmembers responsible are germane to collective bargaining, the union has provided a basis for appraisal of the legitimacy of the fee. *Id.* at 307 n. 18, 106 S.Ct. at 1076 n. 18; *see also Tierney*, 824 F.2d at 1504. I conclude that the auditor need not verify the breakdown between chargeable and nonchargeable expenditures for the notice procedure to comply with *Hudson*.

### 2. Criteria for Categories

 Even though the auditor need not verify the breakdown between chargeable and nonchargeable expenditures within each major category, plaintiffs' argument raises the question of whether the union must provide some verification of its determination that major expense categories are chargeable. In this regard, plaintiffs contend that the notice is deficient because it does not

explain the union's basis for determining that an expenditure is "incurred for representing" the nonmember in his or her "relationship with the employer." *See, e.g., Reese v. City of Columbus,* 798 F.Supp. 463, 468 (S.D.Ohio 1992) (notice must provide adequate disclosure of the methodology used to make the allocation and an auditor's statement showing that methodology chosen was in fact applied correctly); *but see Andrews v. Education Ass'n of Cheshire,* 653 F.Supp. 1373, 1377 (D.Conn.1987) ("court cannot find, on the basis of one clause of one sentence of one footnote in *Hudson,* that the failure to provide an audit of the explanatory memorandum ... renders the proposed system constitutionally deficient."), *aff'd as amended,* 829 F.2d 335 (2nd Cir.1987). A close reading of the text suggests that the union does not have the obligation that plaintiffs seek to impose on it.

First, the text surrounding the footnote only requires the notice to "identify" expenditures for collective bargaining, suggesting that a "showing" or an "explanation" can be the equivalent of such an "identification." Second, the language of the footnote itself limits the "showing" to a category "such as ... payment to [an] affiliate...." It is highly unlikely that the Supreme Court intended for this circumscribed comment to imply that unions would have to show or explain the representational character of all the major expense categories in their budget. Such a breakdown for the majority of the major expense categories would necessitate the "exhaustive and detailed list of all its expenditures" which *Hudson* specifically does not require.[11]

A third practical reason also contraindicates requiring that the union notice support its judgment that a major expense category involves only chargeable expenditures. Given that the Supreme Court has not provided a standard by which to determine what a sufficient showing would be, and given the complexity of the issue of categorization of expenditures as chargeable or noncharge-able, it seems unwise and impractical to dictate to the union the manner and detail by which its notice must demonstrate that an expenditure is chargeable. Such an approach would invite endless litigation as to the exact words which a union must use in its notice.

In sum, *Hudson* does not require the notice prove that an expenditure is germane to public bargaining, but only requires the union to provide sufficient information to enable a nonmember to decide whether or not to make the union offer such proof before a neutral decision maker.

### 3. Local Union Presumption

 Plaintiffs claim that the notice is insufficient under the Constitution because it does not provide a breakdown of those expenditures paid to state and national affiliates. The argument appears quite puzzling since the notice contains no expense category for expenditures to state and national affiliates, and thus informs nonmembers that PEU does not make payments to national and state affiliates.

Plaintiffs also argue that PEU must provide the breakdown of expenditures with regard to each of its forty local affiliates. I do not agree. Contrary to plaintiffs' position, the weight of authority has held, under a technique that has come to be known as the local union presumption, that the union need not provide audited and detailed financial statements of the local and district union affiliates to nonmembers, but may rely on the ratio of chargeable to nonchargeable expenses demonstrated in the PEU's books. *See Hohe v. Casey,* 695 F.Supp. 814, 819 (M.D.Pa.1988), *aff'd,* 868 F.2d 69 (3rd Cir. 1989), *cert. denied,* 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989); *Gillespie v. Willard City Bd. Of Educ.,* 700 F.Supp. 898, 903 (N.D.Ohio 1987); *Andrews,* 653 F.Supp. at 1378; *Robinson v. State of New Jersey,*

---

11. Fifteen of the twenty chargeable expense categories on the 1994 financial statement are: (1) deferred compensation-vacation, (2) health insurance, (3) employee benefits, (4) payroll taxes, (5) taxes and insurance, (6) office supplies, (7) telephone, (8) insurance—general, (9) subscriptions, (10) rent, (11) janitor, (12) automotive, (13) utilities, (14) depreciation, and (15) interest expense. Their relation to the representational duties of the union seems self evident and as noted in the text any greater showing would require detailed examination of each expenditure.

547 F.Supp. 1297 (D.N.J.1982), *rev'd on other grounds,* 741 F.2d 598 (3d Cir.1984); *But see Lowary,* 903 F.2d at 431 (presumption violates *Hudson* in the context of an arbitration proceeding), and *Reese,* 798 F.Supp. at 467 (*Lowary* applies to notice procedures). As has been said, "[t]he presumption underlying this methodology is that local unions spend a larger percent of their budgets on chargeable expenses than do state or national unions." *Reese,* 798 F.Supp. at 467.

It appears to this court that the weight of authority has the better of the argument. The *Hudson* court stressed the practical implications of its notice doctrine. *Hudson,* 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18 (practical reasons why absolute precision in the fee calculation cannot be expected or required). As one district court observed, the local union presumption makes precisely this practical accommodation, since otherwise unions would be put to "the potentially prohibitive cost" of proving the individual percentages of a very large number of affiliates. *Andrews,* 653 F.Supp. at 1377–78. As Chief Judge Henderson also observed, "[n]o authority requires such a breakdown [of expenses incurred on a bargaining unit basis] and we decline to extend existing law to create one. Requiring such a breakdown may be extremely impracticable, if not impossible, as well as unduly burdensome." *Lucid v. City and County of San Francisco,* 774 F.Supp. 1234, 1237 (N.D.Cal.1991).

The purpose of the notice is to provide members with the union's position so they can determine whether they wish to challenge the fee; thus, the notice's efficacy does not depend upon the factual accuracy of what it asserts, which will be determined in the hearing. *See Hohe,* 695 F.Supp. at 814. Accordingly, the question of whether PEU makes the same expenditures on behalf of subordinate units as it does in its general budget is a question of fact which the nonmember may or may not dispute. A dissenting nonmember always has the right to challenge the local union presumption, as well as any other aspect of the union's assertions concerning expenditures before the impartial decision maker. Under these circumstances, it seems inappropriate to require the union to verify, at potentially great cost, an issue which may never arise.

### 4. The Scope of the Auditor's Examination

■ In the matter at bar, the union sought to discharge the duty of "verification" by an independent auditor imposed by *Hudson,* 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18, *supra,* through a letter from an accountant which reported that he had conducted a "review" of the union's books and determined that its financial statements were "in conformity with generally accepted accounting principles."[12] Plaintiffs claim that under *Hudson* the auditor must conduct a full "audit" of the unions books and that the "review" provided by the accountant in the instant case is insufficient.[13] The federal courts' views of what procedure suffices has been less than perfectly consistent.[14]

---

**12.** The auditor described the review as a procedure which "consists principally of inquiries of company personnel and analytical procedures applied to financial data. It is substantially less in scope than an examination in accordance with the generally accepted auditing standards, the objective of which is the expression of an opinion regarding the financial statements taken as a whole." *See* Letter from Charles A. Luther, attached to Complaint as Exhibit B(4).

**13.** The court notes that other courts dealing with the question of the adequacy of the verification of the union's books address the issue after development of a full record exploring the various forms of examination of books. *See, e.g., Gwirtz v. Ohio Educ. Ass'n.,* 887 F.2d 678, 681 (6th Cir.1989); *Hohe,* 727 F.Supp. at 165. This motion is unsupported by such a record thus depriving the court

of what may be crucial information to resolve the issue. Since plaintiffs bear the burden of demonstrating that they will prevail on the merits, the lack of an adequate factual record probably suffices to deny the motion. Accordingly, the discussion in the text above as to what *Hudson* requires in this regard is quite preliminary and subject to revision at trial.

**14.** *See, e.g., Gwirtz,* 887 F.2d at 681 (Auditor's Standard No. 29 proper reporting mechanism and constitutes independent audit because it subjects financial statements to detailed testing), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1810, 108 L.Ed.2d 941 (1990); *Hohe,* 727 F.Supp. at 167 (auditor must perform evaluation of client's internal controls sufficient to form an opinion); *Mitchell v. Los Angeles Unified School Dist.,* 744 F.Supp. 938, 941 & n. 4 (1990) (modified SAS 29

Plaintiffs' insistence on audited books seems inconsistent with the relative tolerance concerning the union's duties articulated in the cases. *Hudson* "does not mandate a union to utilize the *most* detailed and effective service available to audit the financial information disclosed to nonmember employees." *Gwirtz v. Ohio Educ. Ass'n.*, 887 F.2d 678, 682 (6th Cir.1989), *cert. denied*, 494 U.S. 1080, 110 S.Ct. 1810, 108 L.Ed.2d 941 (1990) (emphasis in original). The union need not create "an exhaustive and detailed list of all its expenditures" to enable the fee payer to determine whether or not· to challenge the fee. *Hudson*, 475 U.S. at 306, 307 n. 18, 106 S.Ct. at 1075, 1076 n. 18. Thus, *Hudson* only requires that nonmembers receive "sufficient" information to enable them to determine the propriety of the fair share fee, not that the union provide them with "absolute precision" in the calculation of the fee. *Id.*

Moreover, it appears to this court that the emphasis on practicality in *Hudson*, noted above, also contraindicates imposition of an annual auditing obligation. These practical considerations must include the ability of a small union to financially afford the procedures required by the Court for maintaining an agency shop arrangement.[15] While the union cannot jeopardize the First Amendment rights of nonmembers for practical reasons, those rights are already protected by requiring the union to explain the breakdown between chargeable and nonchargeable expenditures, to escrow any reasonably disputed fee, and to provide a prompt, neutral procedure by which to challenge the fee. Given these safeguards and the Supreme Court's recognition of practical considerations, I cannot find that the auditor's review letter, which reports that the union's financial statements are in conformity with generally accepted accounting principles, does not satisfy *Hudson*'s verification requirement.

## C. The Escrow Procedure

Under the First Amendment, "nonmembers have an absolute right not to support speech they disagree with." *Grunwald*, 994 F.2d at 1373.[16] Accordingly, it has been held that unions cannot "under any circumstances" even temporarily use money obtained by virtue of an agency shop agreement for political or ideological purposes. *Id.*; *Hudson*, 475 U.S. at 305–306, 106 S.Ct. at 1075. Unions must therefore adapt procedures "such as advance reduction of dues and/or interest-bearing escrow accounts" to ensure that they do not use fees collected from nonmembers for activities which nonmembers might reasonably oppose under the First Amendment. *Ellis*, 466 U.S. at 444, 104 S.Ct. at 1890.[17] If the union chooses to safeguard the First Amendment rights of the dissenting nonmember with an escrow account, it must escrow "the amounts reasonably in dispute while such challenges are pending." *Hudson*, 475 U.S. at 310, 106 S.Ct. at 1078. While the union need not escrow those fees undisputedly related to collective bargaining, "it must carefully justify the limited escrow [an escrow equal to less than 100% of the full dues] on the basis of the independent audit, and the escrow figure must itself be independently verified." *Hud-*

---

audit verifying expenditures claimed actually made suffices if performed in accordance with generally accepted accounting principles); *Laramie*, 784 F.Supp. at 1497 ("review" suffices).

**15.** At oral argument, counsel for plaintiffs argued that the union could avoid the financial burden of a full audit by not collecting the agency fee. This approach, however, would encourage free riders, the very condition the agency shop seeks to address. Given "the government's vital policy interest in ... avoiding 'free riders'," *Lehnert*, 500 U.S. at 519, 111 S.Ct. at 1959, I cannot accept plaintiffs' position that a union must choose between an audit it cannot afford on the one hand, or being required to countenance free riders on the other.

**16.** *Grunwald* overstates the case. Nonmembers have an absolute right to be free of government coercing the support of speech with which they disagree. To examine a comparable issue, the First Amendment has never been thought to require that corporate managers determine whether every stockholder concurs with every contribution the corporation makes, despite the fact that corporations exist solely as creatures of the law, i.e., by governmental fiat.

**17.** Merely returning disputed fees after they are collected does not pass constitutional muster because such a procedure enables the union to use the fee as "an involuntary loan" to support political or ideological activities. *Id.*

*son,* 475 U.S. at 310 n. 23, 106 S.Ct. at 1078 n. 23.

The union's procedure here promises a dissenting nonmember that 4% of the total union dues (2% as an advance reduction and an additional 2% into escrow) will not be spent on disputed expenditures until after an independent arbitrator resolves the challenge. The union explains that the escrow and advance reduction provide a "cushion" which guarantees that no agency fee-payer who has objections to the union's political expenditures will have any of his or her monies expended for purposes arguably in violation of the First and Fourteenth Amendments. The figure is based upon the audited financial statements and is independently verified by the fact that those statements show that less than 2% of the budget pays for political and ideological activities.

▮▮▮ Plaintiffs argue that the union does not provide any basis for limiting the "cushion" to 2% of the fair share fee. Plaintiffs, however, do not demonstrate that an amount greater than the 2% cushion is "reasonably in dispute." Since *Hudson* only requires the union to escrow those dues which are reasonably in dispute, plaintiffs do not demonstrate an imminent threat that money will be used for impermissible purposes. A preliminary injunction is thus inappropriate for this claim.

### D. Sufficiency of the Challenged Procedures

▮▮▮ "The nonunion employee, whose First Amendment rights are affected by the agency shop itself and who bears the burden of objecting, is entitled to have his objections addressed in an expeditious, fair, and objective manner." *Hudson,* 475 U.S. at 307, 106 S.Ct. at 1076; *see also Grunwald,* 994 F.2d at 1373. While the Ninth Circuit has held that an appeals procedure which lasts four months is satisfactorily prompt and expeditious, *see Grunwald,* 994 F.2d at 1377, a year seems quite a different story. *See, e.g. Tierney,* 824 F.2d at 1507 (refund after one year following objection not "reasonably prompt" under *Hudson* ); *Lehnert v. Ferris Faculty Ass'n,* 643 F.Supp. 1306, 1333–34 (W.D.Mich. 1986) (even 100% escrow does not justify

waiting until end of fiscal year to address challenges to fee), *aff'd,* 881 F.2d 1388 (6th Cir.1989), *aff'd in part, rev'd in part,* 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991). Here, the union's challenge procedures do not allow the dissenting nonmember to resolve a challenge until over fifteen months after the first fee is deducted from the nonmember's paycheck. *See* Section I *supra.* The union argues that this procedure is necessary because it must wait until after the fiscal year when an audit is completed to determine whether the fee charged was accurate.

Despite the union's argument, resolution of a challenge need not await the end of the fiscal year. The figures for the fair share fee are based upon the financial statement of the previous year. Since the nonmember can challenge the propriety of the chargeable expenditures for the current year by reference to the financial statement from the previous year, the union cannot justifiably delay the challenge procedure until after "the end of the relevant fiscal year when the 'final political activity rebate' figure is determined based on actual expenditures." *Lehnert,* 643 F.Supp. at 1333–34. In sum, the challenge procedures are not "carefully tailored" to minimize any infringement on plaintiffs' First Amendment rights. *Hudson,* 475 U.S. at 303, 106 S.Ct. at 1074.

Under the original notice, the dissenters were required to list their challenges with specificity and under penalty of perjury. The January 10, 1996, memorandum, apparently sent to all agency fee payers, eliminated this requirement. So long as the union continues to comply with this newly announced procedure, the manner by which nonmembers can challenge the fee complies with *Hudson.*

### E. Conclusion with Regard to Likelihood of Success on the Merits

Plaintiffs demonstrate a likelihood of success on the merits with respect to their claim that the union does not provide an adequately prompt procedure for challenging the agency fee. In addition, an order from the court is appropriate to ensure that the "un-

der penalty of perjury" and specificity requirements, removed by the union's January 10, 1996, letter are not reinstituted in the future. *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) (voluntary cessation of illegal conduct does not moot a case because defendant would otherwise be free to return to its old ways).

## IV.

### IRREPARABLE INJURY AND BALANCE OF HARDSHIPS

 Plaintiffs demonstrate irreparable injury because the notice and challenge procedures in an agency shop arrangement implicate the First Amendment. *Abood,* 431 U.S. at 222, 97 S.Ct. at 1792; *see also Hudson,* 475 U.S. at 301, 304 n. 13, 106 S.Ct. at 1073, 1074 n. 13; *Lehnert,* 500 U.S. at 515–16, 111 S.Ct. at 1956–57. "[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) (plurality opinion). Thus, plaintiffs meet their burden of establishing irreparable harm.

The Supreme Court's emphasis on the need to protect nonunion members from paying money to support antithetical ideological activities demonstrates that the balance of hardships favors plaintiffs as well. Accordingly, plaintiffs satisfy both parts of the alternative test for a preliminary injunction with respect to the claim that the union does not provide a sufficiently prompt challenge procedure.

## V.

### ORDER

For all the foregoing reasons, the court hereby ORDERS as follows:

1. The union is preliminarily enjoined from collecting a fair share agency fee until it provides a challenge procedure which allows for the dispute to be resolved within 120 days from the date on which the disputed fee is seized from the nonmembers' paycheck;

2. The "under penalty of perjury" and specificity requirements, removed by the union's January 10, 1996, letter shall not be imposed upon nonmembers in the future; and

3. Plaintiffs shall post bond of $100 for issuance of this preliminary injunction.

IT IS SO ORDERED.