SECURITIES AND EXCHANGE
COMMISSION

v.

THE INFINITY GROUP
COMPANY, et al.

No. CIV. A. 97–5458.

United States District Court,
E.D. Pennsylvania.

Feb. 5, 1998.

Kingdon Kase, C. Annette Kelton, Michael Novakovic, Philadelphia, PA, for Plaintiff.

Klehr, Harrison, Harvey, Branzburg & Ellers by Richard A. Levan, Philadelphia, PA, for Defendant Geoffrey P. Benson.

Saul, Ewing, Remick & Saul by James M. Becker, Philadelphia, PA, for Defendant Geoffrey J. O'Connor.

Montgomery, McCracken, Walker & Rhoads by Richard L. Scheff, Philadelphia, PA, for Defendant Futures Holding Co., et al.

Lindsey Springer, Tulsa, OK, pro se.

Dilworth, Paxson by Bradford McIlvain, Philadelphia, PA, for Court Appointed Trustee, Robert F. Sanville.

### MEMORANDUM

DALZELL, District Judge.

Now before us is an action the Securities and Exchange Commission (hereinafter "SEC" or "Commission") filed on August 27, 1997, alleging that defendants Geoffrey P. Benson, Geoffrey J. O'Connor, and The Infinity Group Company (hereinafter "TIGC") engaged in an ongoing scheme to defraud public investors of their money through the offer and sale of TIGC securities. The complaint further charged that the defendants' actions violated Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b) (hereinafter "1933 Act"), and Section 21(d) of the

Securities Exchange Act of 1934, 15 U.S.C. 78u(d) (hereinafter "1934 Act"). The Commission sought an injunction barring defendants from violating the two Acts, and disgorgement of ill-gotten gains. In addition, the SEC also sought disgorgement from relief defendants Susan L. Benson, JGS Trust, SLB Charitable Trust, Futures Holding Company, and Lindsey K. Springer d/b/a Bondage Breaker Ministries.

On the same day the SEC filed the complaint, Judge Brody, as Emergency Judge, granted the Commission's motion for a temporary restraining order, temporarily enjoining defendants from future violations of the federal securities laws and freezing defendants' and relief defendants' assets.

After hearings on September 3 and 4, 1997, on September 5, 1997, we granted the Commission's motion for a preliminary injunction in the matter. In addition to continuing the injunction and asset-freeze granted in the TRO we also, *inter alia*, appointed Robert F. Sanville, C.P.A., as trustee of the TIGC Trust. We empowered Mr. Sanville to take control and possession of all of TIGC's funds, assets, and other property of TIGC, and directed him to provide an accounting of the Trust. On January 16, 1998, the Trustee submitted that account.

We held a final injunction hearing on February 2 through 4, 1997, at the close of which defendants filed what they styled as a "motion" to dismiss under Fed.R.Civ.P. 12(b)(1), but which in reality is a suggestion of lack of subject matter jurisdiction under Fed. R.Civ.P. 12(h)(3). *See Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874, 880 n. 3 (3d Cir.1992)(noting that the distinction between the two "is simply that [a 12(h)(3) suggestion] may be asserted at any time and need not be responsive to any pleading of the other party"). Defendants' "motion" is without merit.

 In order to invoke the protections of the securities laws, the Commission must, as a threshold matter, show that TIGC's "property transfer agreement" was a securi-ty. Among other categories of instruments included within the definition of a "security" under § 2(a)(1) of the 1933 Act and § 3(a)(10) of the 1934 Act is the category of "investment contracts." In *SEC v. W.J. Howey*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* 66 S.Ct. at 1103. It is the representations made by the promoters, not their actual conduct, that determine whether an interest is an investment contract or other security. *SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 211, 87 S.Ct. 1557, 1562, 18 L.Ed.2d 673 (1967); *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351, 64 S.Ct. 120, 123–24, 88 L.Ed. 88 (1943).

There is ample documentary and testimonial evidence that many people invested money with TIGC. Indeed, the Trustee has produced a list of over 10,000 people, based on TIGC's own records, who invested in excess of $26.6 million in the TIGC Trust. Thus, element one of *Howey* is satisfied.

The Commission has also satisfied its burden of proof as to element two of *Howey*, which requires showing that, by mailing checks to TIGC, TIGC's members were investing in a "common enterprise." There are two definitions of a "common enterprise," one based on "horizontal commonality" and the other based on "vertical commonality." Horizontal commonality has been explicitly adopted by the our Court of Appeals, but that Court has not yet decided whether to adopt vertical commonality. *See Steinhardt Group, Inc. v. Citicorp*, 126 F.3d 144, 152 (3d Cir.1997). We find that the record amply supports finding "horizontal commonality" in TIGC's operations, and therefore—although we think that vertical commonality also exists on these facts, and we note that the Fourth, Eighth, Ninth, and Tenth Circuits have all adopted vertical as well as horizontal commonality[1]—we find it unnecessary to determine whether to adopt that definition as well.

---

1. The Fifth, Eighth, Ninth, and Tenth circuits have adopted "vertical commonality." *See Brodt v. Bache & Co., Inc.*, 595 F.2d 459, 461 (9th Cir.1978); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478 (5th Cir.1974); *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414, 418 (8th

According to our Court of Appeals, horizontal commonality "requires a pooling of investors' contributions and distribution of profits and losses on a pro-rata basis among investors." *Steinhardt v. Citicorp.*, 126 F.3d 144, 151 (3d Cir.1997). *Salcer v. Merrill Lynch, Pierce, Fenner and Smith*, 682 F.2d 459, 460 (3d Cir.1982), the only other Third Circuit case to address horizontal commonality, focused on pooling of investor funds. Our review of cases in other Circuits that apply the definition of horizontal commonality suggests that pooling of investor funds is most often the determinative factor. It does not appear that the defendants object to the evidence of pooling, nor could they. TIGC's literature is rife with references to pooling, such as the following from a widely-distributed TIGC offering document:

> The Infinity Group Company invests for profit by accepting amounts as low as $1,200 from thousands of people like you, and **creating large blocks of funds that are in the millions of dollars.** This gives the Trust a leverage position whereby we can command large profits, and have the security of never putting the principal at risk. **This is very sophisticated investing** that cannot be accomplished unless you have millions of dollars to deposit in a top world U.S. bank.

Ex. 499 at "Private Member Material and Manual" at unnumbered p. 5 (emphasis in original). In addition, TIGC's description of the "trading programs" to which they had access also confirms the existence of investor pooling: "These 'trading' programs are run by a very tight knit inner circle that requires an invitation by the right person and a large amount of cash, for you to get even a hint of what is transpiring." Ex. 499 at "TIGC Private Member Manual" at 1.

Defendants only object to the second aspect of horizontal commonality, *i.e.*, that profits and losses are shared on a *pro rata* basis among investors. They argue that because the investment contracts were fixed at either 138% or 181%, investors did not share *pro rata* in profits and losses.

Defendants' argument fails in three respects. First, the Supreme Court stated in *Howey* that "[t]he definition of a security embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 66 S.Ct. at 1103; *see also Tcherepnin v. Knight*, 389 U.S. 332, 338 88 S.Ct. 548, 554 (1967). In other words, the duck theory applies: if it looks, reads, and sounds like an investment contract, it *is* an investment contract. TIGC's get-rich-without-risk scheme certainly is such a duck.

Second, defendants' claim that investors do not share *"pro rata"* in TIGC's gains and losses because of TIGC's fanciful guarantees of principal and profit is unavailing because, as Chief Judge Posner so pungently put it, "[i]t would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws." *SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir.1995). In order to accept defendants' contention, we would have to endorse the fiction of complete guarantee and zero risk littered throughout TIGC's materials. This record—in which TIGC never earned one penny's return on at least $11.9 million invested—simply will not support such an endorsement.

Third, and more importantly, even if we were to accept defendants' argument that the definition for horizontal commonality should be narrowly and literally construed, we still find it to be present here. Dictionary definitions of standard English usage confirm that *pro rata* means "in proportion to the value or extent (of his interest)." XII *Oxford English*

---

Cir.1974); *McGill v. American Land & Exploration Co.*, 776 F.2d 923, 925 (10th Cir.1985).

In an enterprise marked by vertical commonality, the investors' fortunes need not rise and fall together; a *pro rata* sharing of profits and losses is not required. Two distinct kinds of vertical commonality have been identified: "broad vertical commonality" and "strict vertical commonality". To establish "broad vertical commonality", the fortunes of the investors need be linked only to the efforts of the promoter. *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir.1994). "Strict vertical commonality" requires that the fortunes of investors be tied to the fortunes of the promoter. *Id.* Here, there is clearly broad vertical commonality, and arguably strict vertical commonality as well.

*Dictionary* 529 (2d ed.1989). Black's Law Dictionary defines *pro rata* as "proportionately; according to a certain rate, percentage, or proportion." *Id.* at 1220 (6th ed.1990). Such percentages are trumpeted throughout TIGC's materials: either 138% or 181%, depending on how much is invested. *Pro rata* does not imply, as defendants appear to believe, that the investors' shares must be equal or variable. If our Court of Appeals had so intended, it might have used the term *per capita,* which Black's defines as "by the heads or polls ... share and share alike." *Id.* at 1136. Thus, horizontal commonality is present in this investment scheme.

Lastly, the Commission has proven element three of *Howey, i.e.,* that the investors were led to believe that profits on their moneys would be generated solely from the efforts of TIGC's trustees and employees. By constructing in their offering materials a Wonderland of international finance, into which only they, and not the uninitiated Alice, could step through the looking glass, defendants encouraged investors to commit their money to TIGC's treasury and then rely exclusively on TIGC's investment efforts. For example, TIGC's "Financial Resources Special Report," page two, provides that "[y]ou will never have to sell anything to anyone. Never buy any products that you don't want. Never recruit. And you will still make a good profit." *Id.* Page six of that report is even more unequivocal, assuring the prospective investor that he or she need only send TIGC a check and "you are guaranteed 100% that you will make a profit ... [*sic* ] Even if you do nothing else you will be earning money right from the start." *Id.*

We have little trouble, therefore, finding that the Commission has met *Howey* 's definition of an investment contract, and thus TIGC's investment offerings were securities within the meaning of the 1933 and 1934 Acts. Defendants' suggestion that we do not have jurisdiction over this subject matter is therefore without merit.

An Order follows.

*ORDER*

AND NOW, this 5th day of February, 1998, upon consideration of "defendants' motion to dismiss plaintiff's complaint for lack of subject matter jurisdiction", which we shall treat as a suggestion of lack of subject matter jurisdiction pursuant to Fed. R. Civ. 12(h)(3), and for the reasons cited in the accompanying Memorandum, it is hereby ORDERED that the "motion" is DENIED.