Leroy ROBINSON and Jay Dino, Plaintiffs

v.

PENNSYLVANIA STATE CORRECTIONS OFFICERS ASSOCIATION, et al., Defendants

No. CIV.A.1:02–CV–1124.

United States District Court, M.D. Pennsylvania.

Feb. 4, 2005.

See also 299 F.Supp.2d 425.

---

2. 42 U.S.C. § 1983 (1988).

3. N.J. Stat. Ann. 9:6B–1 to 9:6B–6 (1991).

4. N.J. Stat. Ann. § 59:1–2 (1972).

Debra K. Wallet, Frank P. Clark, Clark Law Office, Camp Hill, PA, for Plaintiffs.

Linda S. Lloyd, Office of Attorney General, Harrisburg, PA, Stephen J. Holroyd, Thomas W. Jennings, Sagot, Jennings & Sigmond, Philadelphia, PA, for Defendants.

### MEMORANDUM

CONNER, District Judge.

Once again the court must consider the efforts of defendant, the Pennsylvania State Corrections Officers Association ("Association"), to impose a "fair share fee" on nonunion public employees in a manner consistent with the First Amendment. The court previously held that a fee assessed by the Association from December 2001 through mid–2003 was unconstitutional because advance notice was not provided to employees.[1] Now under review, in the context of cross-motions for summary judgment, is a subsequent fee collected from mid–2003 to mid–2004 and preceded by notice dated March 15, 2003. Whether this notice provided a constitutionally adequate explanation of the basis for the fair share fee is the dispositive issue for resolution.

### I. Statement of Facts [2]

The Association was named as exclusive bargaining representative for employees of Pennsylvania corrections and forensic facilities in 2001 and soon entered into a new collective bargaining agreement on their behalf. One provision of the agreement required the Commonwealth to deduct a fair share fee from nonunion employees and to remit these funds to the Association to finance its activities. (Doc. 46 ¶¶ 1–3; Doc. 50 ¶¶ 1–3). The Association notified the Commonwealth that a fee of 1.00% of nonunion employees' gross pay was appropriate to meet the Association's expenses. In late 2001, without prior notice to employees, the Commonwealth began deducting the fee from salaries of nonunion employees and remitting these amounts to the Association. (Doc. 46 ¶¶ 4–5; Doc. 50 ¶¶ 4–5; see also Doc. 37 at 2).

On March 15, 2003, the Association issued a notice to nonunion employees, stating that a new fair share fee would be assessed starting in April 2003.[3] The sixteen-page document explains the nature

---

**1.** A more extensive discussion of this holding is presented in the court's previous decision, *Robinson v. Pa. State Corr. Officers Ass'n,* 299 F.Supp.2d 425 (M.D.Pa.2004), and familiarity with that opinion is presumed.

**2.** In accordance with the standard of review for motions for summary judgment, the facts presented are not subject to reasonable dispute between the parties. *See infra.* Part II.

**3.** The notice also describes an arbitration procedure, under the auspices of the American Arbitration Association, to resolve objections to the fair share fee. (Doc. 49, Ex. 1).

and basis of the fee. It lists thirty-two types of expenses, categorized by their relationship to the collective bargaining activities of the union, and indicates that only those expenses that are "germane" to such activities will be charged to nonunion employees. (Doc. 44, Ex. 1; Doc. 46 ¶ 6; Doc. 50 ¶ 6). The percentage of "chargeable expenses" to total expenses, according to the notice, is approximately 77.67%. By multiplying this percentage by the dues rate for union members (1.50% of wages), the notice concludes that the fair share fee is 1.17% of wages. (Doc. 44, Ex. 1).

Appended to the notice is an audit report of the "major categories of expenses" on which the fair share fee calculation was based. The report states that the purpose of the audit was to "obtain a reasonable assurance about whether the schedule of expenses and allocation between chargeable and nonchargeable expenses is free of material misstatement." (Doc. 44, Ex. 1). The attached schedule details seventeen categories of expenses incurred by the union in 2002, including "salaries and wages," "affiliation [costs]," and "rent and utilities." These categories are divided between chargeable and nonchargeable expenses, and notes to the report describe the union's methodology in classifying certain costs as chargeable to nonunion employees. The report states that the percentage of chargeable expenses to total expenses is approximately 77.67%, and, by multiplying this percentage by the union dues rate, concludes that the fair share fee is 1.17% of wages. (Doc. 44, Ex. 1).

Shortly after distribution of the notice, plaintiffs and several other nonunion employees filed objections with the Association, challenging the "calculation of chargeable expenses and the amount of the [f]air [s]hare [f]ee." The objections were referred to the American Arbitration Association ("AAA"), pursuant to procedures outlined in the notice, and hearings were scheduled for September 2003 before an arbitrator selected by the AAA. The hearings were subsequently rescheduled at the request of plaintiffs, and did not commence until March 2004. (Doc. 46 ¶¶ 8–9, 11–14; Doc. 50 ¶¶ 8–9, 11–14; Doc. 50, Exs. K, L; Doc. 51, App. E).

Before and during this period, plaintiffs prosecuted the above-captioned case on behalf of a class of nonunion employees.[4] They claim that the Association's fee assessment infringed upon their First Amendment rights. (Docs.1, 16). The court ruled in January 2004 that the collection of fair share fees prior to the March 15, 2003, notice violated nonunion employees' rights, but deferred entry of judgment pending resolution of plaintiffs' remaining claims.[5] The parties thereafter filed cross-motions for summary judgment on the adequacy of the March 15, 2003, notice and objection procedures.[6] (Docs.42, 44). Oral argument on the motions was held on January 31, 2005. (Doc. 68).

## II. *Standard of Review*

Summary judgment is appropriate when the evidence of record unquestionably establishes the validity of one party's position. *See* FED. R. CIV. P. 56(c), (e); *Pappas*

---

4. The court certified plaintiffs as representatives of a class comprising nonunion members "who at any time since December 2001 had deducted from their pay a fair share fee that was remitted to [the Association] or will have such a fair share fee deducted from their pay at any time before this litigation is resolved." (Doc. 16).

5. *See Robinson,* 299 F.Supp.2d at 430–31.

6. Resolution of the cross-motions, filed in March 2004, was delayed by interim settlement discussions among the parties. (Docs.57, 59).

*v. City of Lebanon*, 331 F.Supp.2d 311, 315 (M.D.Pa.2004). Doubts over the weight to be accorded testimony and exhibits must be resolved in favor of the opposing party, which must be given the benefit of all reasonable inferences to be drawn from the evidence. *Schnall v. Amboy Nat'l Bank*, 279 F.3d 205, 209 (3d Cir.2002). Only if the facts of the case, so construed, demonstrate that one party cannot succeed on its claim or defense should summary judgment be entered. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

This task is more difficult when the court is presented with cross-motions for summary judgment: when both the plaintiff and the defendant are non-moving parties and each is entitled to consideration of the evidence in its favor. *Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown*, 318 F.Supp.2d 230, 235–36 (M.D.Pa. 2004). However, the dispositive issue in this case—the facial adequacy of the notice—does not implicate factual disputes susceptible to different standards of review. The notice has been submitted to the court, and both parties agree on its contents and authenticity. The only question, whether the notice satisfies constitutional disclosure requirements, is one of law and may be resolved on the summary judgment record. *See Chi. Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292, 307 & n. 18, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); *Hohe v. Casey*, 956 F.2d 399, 403 (3d Cir.1992).

### III. *Discussion*

Many states, including Pennsylvania, permit "agency shop" arrangements between an employees' union and a public employer. *See* 43 PA. STAT. § 211.7; PA. STAT. ANN. tit. 71, § 575; *see also Otto v. Pa. State Educ. Ass'n–NEA*, 330 F.3d 125, 129 (3d Cir.), *cert. denied*, 540 U.S. 982,

124 S.Ct. 466, 157 L.Ed.2d 372 (2003). Under these arrangements, a single union is designated as the exclusive representative of employees, regardless of individual union membership. *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 224, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *see* 43 PA. CONS. § 211.7. Other unions are precluded from participating in contract negotiations, and the final agreement reached by the designated union affects all employees. *Abood*, 431 U.S. at 224, 97 S.Ct. 1782.

That employees may reap the benefit of union negotiations without joining the organization creates an obvious "free-rider" problem. *See id.* at 222–26, 231, 234–35, 97 S.Ct. 1782. The incentive for employees to join a union, and to assume the obligation of union dues, is to draw on the collective bargaining power of the organization. *Id.* at 221–22, 97 S.Ct. 1782. Under an agency shop arrangement, however, employees enjoy the results of the union's exertions whether or not they accept membership. Individual employees have little incentive to forgo a percentage of their paycheck to obtain a benefit that they will receive anyway. *See id.* at 222–26, 231, 234–35, 97 S.Ct. 1782.

To counter this problem, Pennsylvania and most other states permit unions to impose a "fair share fee" on nonunion employees, requiring them to contribute an equal share to the union's costs of operation. *See* PA. STAT. ANN. tit. 71, § 575; *see also Otto*, 330 F.3d at 129. The fee, generally negotiated pursuant to the collective bargaining agreement, is normally set as a percentage of nonunion employees' salaries. It is then periodically assessed by the employer and remitted to the union. *See Abood*, 431 U.S. at 222–23, 235–36, 97 S.Ct. 1782.

■ The fee substantially eliminates the free-rider problem but it creates a constitutional free speech issue. *See id.; see*

*also Hudson,* 475 U.S. at 302–03, 106 S.Ct. 1066. It is a compulsory assessment on nonunion employees for the purpose of subsidizing speech by the union. *Id.; Abood,* 431 U.S. at 221–26, 235–36, 97 S.Ct. 1782. The forced exaction that the fair share fee represents undoubtedly constitutes an infringement on nonunion employees' freedom of expression. *Hudson,* 475 U.S. at 302–03, 106 S.Ct. 1066; *Abood,* 431 U.S. at 221–26, 235–36, 97 S.Ct. 1782.

■ Nevertheless, this infringement is constitutionally justified to support the national interest in collective bargaining. *Id.* at 231–35, 97 S.Ct. 1782; *accord Hudson,* 475 U.S. at 302–03, 106 S.Ct. 1066. The First Amendment is not an absolute. *See, e.g., Marks v. United States,* 430 U.S. 188, 193–94, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). The national interest in fostering collective bargaining activities supports the limited imposition on First Amendment rights represented by the fair share fee. *See Abood,* 431 U.S. at 225–26, 231, 97 S.Ct. 1782. The fee may be imposed "to finance expenditures by the [u]nion for the purposes of collective bargaining, contract administration, and grievance adjustment." *Id.*

The fee may not be used, however, to subsidize "ideological" and "political" activities. *Robinson v. Pa. State Corr. Officers Ass'n,* 299 F.Supp.2d 425, 428 (M.D.Pa. 2004) (quoting *Hudson,* 475 U.S. at 305, 106 S.Ct. 1066).

Whatever the benefits of union representation, they cannot outweigh the First Amendment rights of nonunion employees to support only that political speech with which they agree. Unions may not use funds obtained through a fair share fee to advance "political views, ... political candidates, or ... other ideological causes not germane to [their] duties as ... collective-bargaining representative." Any appropriation of a nonunion employee's earnings for an impermissible use, even if the funds are later returned, constitutes a violation of the employee's First Amendment rights.

*Id.* (quoting *Abood,* 431 U.S. at 235, 97 S.Ct. 1782) (internal citations omitted).

■ The Constitution limits the fair share fee to nonunion employees' *pro rata* share [7] of the union's expenditures for collective bargaining activities. *See Lehnert v. Ferris Faculty Ass'n,* 500 U.S. 507, 524, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991); *Abood,* 431 U.S. at 225–26, 231, 97 S.Ct. 1782; *Ping v. Nat'l Educ. Ass'n,* 870 F.2d 1369, 1372 (7th Cir.1989). The fee may be used *only* to standardize the financial burden on employees in supporting these activities. *See Lehnert,* 500 U.S. at 524, 111 S.Ct. 1950; *Abood,* 431 U.S. at 225–26, 231, 97 S.Ct. 1782. In other words, the reve-

---

**7.** Defining this phrase is essential to understanding the careful constitutional balance struck by the Supreme Court. *See Lehnert v. Ferris Faculty Ass'n,* 500 U.S. 507, 524, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991); *Abood,* 431 U.S. at 225–26, 231, 97 S.Ct. 1782. *Pro rata*—literally, "for the rate"—means "in proportion to the value or extent (of his [or her] interest)." 12 Oxford English Dictionary 529 (2d ed.1989); *see also* Black's Law Dictionary 1236 (7th ed.1999) (defining *pro rata* as "[p]roportionately; according to an exact rate, measure, or interest"). When phrased as a percentage of salary (as is a fair share fee), a person's *pro rata* share of a group asset

or liability is determined by dividing the value of the asset or liability (i.e., chargeable expenses) by the total salary of all members of the group. *See Hohe v. Casey,* 740 F.Supp. 1092, 1097 (M.D.Pa.1989), *vacated in part on other grounds,* 956 F.2d 399 (3d Cir.1992); *see also Bagnall v. Air Line Pilots Ass'n, Int'l,* 626 F.2d 336, 339 (4th Cir.1980); *S.E.C. v. Infinity Group Co.,* 993 F.Supp. 321, 323 (E.D.Pa.1998), *aff'd,* 212 F.3d 180 (3d Cir. 2000). The resulting percentage, when assessed against each employee's salary (whatever the actual amount thereof), will produce revenues equal to the value of the asset or liability.

nues that would be generated by assessment of the fee on all employees—union and nonunion—must equal (or at least reasonably approximate) the expenses of the union related to chargeable activities. *Id.; see also Hudson*, 475 U.S. at 306–07, 106 S.Ct. 1066. A fee that generates revenues in excess of these costs represents an unwarranted infringement on nonunion employees' First Amendment rights. *Abood*, 431 U.S. at 225–26, 231, 97 S.Ct. 1782.

To ensure that the fee does not exceed constitutional limitations, the Supreme Court, in the seminal case of *Chicago Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), announced several "procedural safeguards" that must be instituted prior to collection of a fair share fee. *See id.* at 305–06, 309, 106 S.Ct. 1066. "Perhaps the most important of these is advance notice to nonunion employees explaining the method by which the fee was calculated."[8] *Robinson*, 299 F.Supp.2d at 428. Advance notice is necessary to provide employees with "sufficient information to gauge the propriety of the union's fee" and, if appropriate, to lodge an objection thereto. *Hudson*, 475 U.S. at 306, 106 S.Ct. 1066.

The content of the notice is a matter of significant debate. *See Otto*, 330 F.3d at 128; *Tierney v. City of Toledo*, 917 F.2d 927, 933–38 (6th Cir.1990); *Prescott v. County of El Dorado*, 915 F.Supp. 1080, 1086 & n. 9 (E.D.Cal.1996). The Supreme Court stated in *Hudson* that the notice must provide an "adequate explanation of the basis for the fee." *Hudson*, 475 U.S. at 310, 106 S.Ct. 1066. In a footnote, the Court remarked that it should include "the major categories of expenses" incurred by the union during the previous year, verification by an "independent auditor," and "an explanation of the share" of expenses devoted to collective bargaining activities. *Id.* at 307 n. 18, 106 S.Ct. 1066. Beyond these nebulous formulations, however, the Court declined to address further the nature of a constitutionally sufficient notice.[9]

■ The requisite content of the *Hudson* notice must be assessed in light of the purpose contemplated by the Supreme Court. *See Hohe*, 956 F.2d at 410; *see also Gilpin v. Am. Fed'n of State, County, & Mun. Employees*, 875 F.2d 1310, 1316 (7th Cir.1989); *Damiano v. Matish*, 830 F.2d 1363, 1369–70 (6th Cir.1987); *cf. Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 876–77, 118 S.Ct. 1761, 140 L.Ed.2d 1070 (1998). The notice was not intended to provide a full financial background of the union. *See Hohe*, 956 F.2d at 410; *see also Gilpin*, 875 F.2d at 1316 (stating that notice should not be as "complicated as an SEC prospectus"). Nor was it meant to detail with "absolute precision" the expenses and revenues involved in the fair share fee calculation. *Hudson*, 475 U.S. at 307 n. 18, 106 S.Ct. 1066; *see also Hohe*, 956 F.2d at 410; *Tavernor v. Ill. Fed'n of Teachers*, 226 F.3d 842, 850 (7th Cir.2000). Rather, it was designed to give nonunion employees the information necessary to evaluate whether they should challenge the union's fair share fee as an unconstitutional infringement on their expressive

---

8. Unions must also provide nonunion employees with "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker[] and an escrow for the amounts reasonably in dispute while such challenges are pending." *Hudson*, 475 U.S. at 310, 106 S.Ct. 1066.

9. That all of these seemingly important admonitions were raised in a footnote of the Court's opinion surely adds to the discomfiture of and debate among the lower federal courts. *See, e.g., Andrews v. Educ. Ass'n of Cheshire*, 829 F.2d 335, 339 (2d Cir.1987) (noting location of these statements); *Prescott*, 915 F.Supp. at 1086 & n. 9 (same).

rights.[10] *See Hudson,* 475 U.S. at 306–07 & n. 18, 106 S.Ct. 1066; *Hohe,* 956 F.2d at 410–11; *see also Hudson v. Chi. Teachers Union, Local No. 1,* 922 F.2d 1306, 1314 (7th Cir.1991).

■ It follows that the cardinal purpose of the *Hudson* notice is disclosure of the relationship between the fair share fee and nonunion employees' *pro rata* share of union expenses attributable to collective bargaining activities. *See Hudson,* 475 U.S. at 306–07, 106 S.Ct. 1066; *Hohe,* 956 F.2d at 410. As discussed previously, the *only* constitutionally permissible function of the fair share fee is to standardize the financial burden on union and nonunion employees in supporting the collective bargaining activities of the "agency shop" union. *See Lehnert,* 500 U.S. at 524, 111 S.Ct. 1950; *see also Abood,* 431 U.S. at 225–26, 231, 97 S.Ct. 1782. Revenues generated by assessment of the fair share fee on *all* employees—union and nonunion—must equal the union's expenses devoted to collective bargaining activities.[11] *Id.; see also Hudson,* 475 U.S. at 306–07, 106 S.Ct. 1066. A notice that does not describe this essential equation fails the fundamental goal of *Hudson* and does not sufficiently protect the constitutional rights of nonunion employees.

The specific conditions identified in the *Hudson* footnote are merely means to achieve this overarching end. A list of the "major categories" of expenses assists non-union employees in determining the extent and nature of the union's chargeable expenditures. *See Hohe,* 956 F.2d at 410. Verification by an "independent auditor" provides reasonable assurance of the accuracy of financial disclosures. *Otto,* 330 F.3d at 134–35. And "an explanation of the share" of expenses devoted to collective bargaining activities permits employees to evaluate the union's justification for the fee. *Hohe,* 956 F.2d at 410. But these details are meaningless in assessing the constitutionality of a fair share fee unless they are accompanied by disclosure of the relationship between the fair share fee and nonunion employees' *pro rata* share of union expenses attributable to collective bargaining activities. *See Lehnert,* 500 U.S. at 524, 111 S.Ct. 1950; *Abood,* 431 U.S. at 225–26, 231, 97 S.Ct. 1782; *Hohe,* 956 F.2d at 410–11; *see also Hudson,* 475 U.S. at 306–07, 106 S.Ct. 1066.

The Sixth Circuit has gone further, holding in *Tierney v. City of Toledo,* 917 F.2d 927 (6th Cir.1990), that the *Hudson* notice must disclose the union's *total* annual income—including profits from sources other than employee dues and fees—when necessary to corroborate the union's assertions regarding funding of political activities. *See id.* at 938. This conclusion is untenable. The accuracy of expenses listed in the notice is reasonably assured through the independent auditor requirement, *see Otto,* 330 F.3d at 134–35,[12] and

**10.** *See Dashiell v. Montgomery County,* 925 F.2d 750, 756 (4th Cir.1991) ("The test of adequacy of the initial explanation to be provided by the union is not whether the information supplied is sufficient to enable the employee to determine in any final sense whether the union's proposed fee is a correct one, but only whether the information is sufficient to enable the employee to decide whether to object."); *see also Knight v. Kenai Peninsula Borough Sch. Dist.,* 131 F.3d 807, 813–14 (9th Cir.1997) (same); *Jibson v. Mich. Educ. Ass'n–NEA,* 30 F.3d 723, 730 (6th Cir.1994) (same); *Hudson v. Chi. Teachers Union, Local No. 1,* 922 F.2d 1306, 1313–14 (7th Cir.1991) (same); *Prescott,* 915 F.Supp. at 1086 & n. 9 (same).

**11.** *See supra* note 7 and accompanying text.

**12.** *See also Tierney,* 917 F.2d at 936 ("[A]n auditor's role is to verify the expenditures made by the union so as to ensure that the expenditures that the union claims it made for particular expenses were actually made for those expenses.") (quoting *Gwirtz v. Ohio*

substantive challenges to the veracity of these figures should be resolved through objections to the fair share fee calculation itself, *see Hudson*, 922 F.2d at 1313–14.[13] Although unclear from the opinion, the notice in *Tierney* apparently disclosed collective bargaining expenses from the previous year and revenues to be generated by the fair share fee as applied to all employees. *See Tierney*, 917 F.2d at 938–39. The Sixth Circuit did not cogently explain the need for more elaborate financial information, and this court declines to modify the careful balance struck in *Hudson* "[a]bsent a counter directive by the Supreme Court." *Otto*, 330 F.3d at 132–33.

◾ The *Hudson* notice need provide only enough information for nonunion employees to gauge whether the fair share fee proposed by the union arguably exceeds their *pro rata* share of expenses attributable to collective bargaining activities. *Hudson*, 475 U.S. at 306–07, 106 S.Ct. 1066; *Hohe*, 956 F.2d at 410. It should list the prior year's expenditures, reasonably categorized to indicate their use, with verification by an independent auditor. *Hudson*, 475 U.S. at 307 n. 18, 106 S.Ct. 1066; *see also Hohe*, 956 F.2d at 410–11; *Otto*, 330 F.3d at 134–35 & n. 9. These expenditures should be further divided into "chargeable" and "nonchargeable" costs, with a general explanation of the basis for these allocations. *Hudson*, 922 F.2d at 1314–16; *see also Hohe*, 956 F.2d at 410–11; *Gilpin*, 875 F.2d at 1316; *Damiano*, 830 F.2d at 1369–70. Most importantly, the notice must link the total chargeable expenditures to the revenues to be generated by the fair share fee, if applied to all employees.[14] *Hudson*, 475 U.S. at 306–07, 106 S.Ct. 1066; *see also Lehnert*, 500 U.S. at 524, 111 S.Ct. 1950. Only with this information can the potential objector make an intelligent decision on whether to test the validity of the fee through formal objection.[15] *See Hudson*, 475 U.S. at 306–07, 106 S.Ct. 1066; *Hohe*, 956 F.2d at 410–11.

◾ The notice issued by the Association on March 15, 2003, followed the disclosures suggested by the *Hudson* footnote. It lists seventeen "major categories" of expenses incurred by the Association in the previous year. These expenses are

---

*Educ. Ass'n*, 887 F.2d 678, 682 n. 3 (6th Cir.1989)).

**13.** *See also Tierney*, 917 F.2d at 935 ("Ensuring adequate disclosure to enable a non-member to object … is materially different from determining … whether the calculations and methodology … are acceptable.").

**14.** *See supra* note 7 and accompanying text.

**15.** "New unions" obviously do not have a history of prior expenditures on which to base their fair share fee calculation. Nevertheless, they are not excused from the *Hudson* advance notice requirement. *Robinson*, 299 F.Supp.2d at 430 (rejecting "new union" exception to the advance notice requirement). They must provide nonunion employees with reasonably accurate estimates, based on verifiable sources, of the likely expenditures of the union in the upcoming year and must link those costs to the income to be generated by the fair share fee, if applied to all employees. *See Hudson*, 475 U.S. at 307 n. 18, 106 S.Ct. 1066 (stating that unions "cannot be faulted for calculating [a] fee on the basis of [their] expenses during the preceding year" but declining to prescribe particular grounds on which unions must base calculations); *see also Otto*, 330 F.3d at 134–35 & n. 9 (requiring verification of expense figures); *supra* note 7 and accompanying text; *cf. Thomas v. NLRB*, 213 F.3d 651, 660 (D.C.Cir.2000) (upholding "local union" presumption, in which local union relies on national union expenditures in estimating share of expenses devoted to collective bargaining activities, if adequately justified by circumstances) (citing *Hohe*, 956 F.2d at 410).

verified by an "independent auditor."[16] And notes to the audit provide an "adequate explanation" of the union's method for determining the share of expenses attributable to collective bargaining activities. *See Hudson,* 475 U.S. at 307 n. 18, 106 S.Ct. 1066.

However, the notice failed in its primary duty: to link the fair share fee to nonunion employees' *pro rata* share of union expenses attributable to collective bargaining activities. *See id.* at 306, 106 S.Ct. 1066. The notice issued by the Association identifies the expenses attributable to collective bargaining activities and converts this amount into a percentage of total expenditures, which is then multiplied by the union dues rate to arrive at the fair share fee. The error in this calculation is that it is based on *union dues,* rather than the revenues necessary to cover chargeable expenses. *See Abood,* 431 U.S. at 225–26, 231, 97 S.Ct. 1782. Union dues may bear little or no relation to chargeable (or total) expenses of the union,[17] and are essentially irrelevant to computation of the fair share fee.

■ The Association may have been led astray by dicta in several cases, which appear to sanction the calculation of a fair share fee based upon "the proportion of chargeable expenditures to total dues." *Tierney,* 917 F.2d at 938–39; *see also, e.g., Damiano,* 830 F.2d at 1367 & n. 5; *Laramie v. County of Santa Clara,* 784 F.Supp. 1492, 1499 (N.D.Cal.1992). The court re-

jects these formulations and the accompanying suggestion that "the Supreme Court has not specified what methodology a union must use to calculate the [fair share] fee." *Tierney,* 917 F.2d at 938–39. To the contrary, the Supreme Court has repeatedly provided a formula for computing the fair share fee: the employee's *pro rata* share of chargeable expenses. *Lehnert,* 500 U.S. at 524, 111 S.Ct. 1950; *Abood,* 431 U.S. at 225–26, 231, 97 S.Ct. 1782.

This share, phrased as a percentage of salary, is calculated by dividing chargeable expenses of the union by the total salary of all employees, union and nonunion.[18] *See Hohe v. Casey,* 740 F.Supp. 1092, 1097 (M.D.Pa.1989), *vacated in part on other grounds,* 956 F.2d 399 (3d Cir.1992); *see also Bagnall v. Air Line Pilots Ass'n, Int'l,* 626 F.2d 336, 339 (4th Cir.1980); *S.E.C. v. Infinity Group Co.,* 993 F.Supp. 321, 323 (E.D.Pa.1998), *aff'd,* 212 F.3d 180 (3d Cir.2000). The resulting percentage represents each employee's "fair share" (i.e., *pro rata* share) of the chargeable expenses of the union. *See Lehnert,* 500 U.S. at 524, 111 S.Ct. 1950; *Abood,* 431 U.S. at 225–26, 231, 97 S.Ct. 1782. By applying this methodology, and describing it in a *Hudson* notice, the union informs non-members of chargeable expenses and expected revenues and provides them with a basis on which to assess the constitutionality of the fee. *See Hudson,* 475 U.S. at 306–07, 106 S.Ct. 1066; *Hohe,* 956 F.2d at 410–11.

**16.** In light of the court's disposition of the cross-motions, the issue of whether the auditor in this case was "independent" of the union need not be resolved. The court notes, however, that the auditor was not employed or otherwise controlled by the Association. *See Otto,* 330 F.3d at 134 n. 9 (stating that, to "be truly independent of the local union," the auditor may not be "an accountant employed in-house by the union").

**17.** For example, the union could hold a portion of a year's income in reserve. *See Wessel v. City of Albuquerque,* 327 F.Supp.2d 1332, 1338–40 (D.N.M.2004). Indeed, financial documents submitted in this case (Doc. 50, Ex. B) suggest that the Association follows this practice. *Cf. infra* note 20 (discussing propriety of a union "saving" a portion revenues from fair share fees).

**18.** *See also supra* note 7 and accompanying text.

■ The fair share fee calculation presented in the March 15, 2003, notice was not based on chargeable expenses, as required by the First Amendment, but instead was based on union dues. The notice is devoid of any reference to revenues anticipated from the fair share fee, as applied to all employees, and it offers no information by which these revenues may be determined.[19] Without disclosure of this information, the constitutionality of the fair share fee cannot be reasonably evaluated, or even broached.[20] *See Hudson*, 475 U.S. at 306–07, 106 S.Ct. 1066; *Hohe*, 956 F.2d at 410; *see also Hudson*, 922 F.2d at 1314.

The Association seems to have missed the *Hudson* forest for the trees. Like those in *Hudson* and other cases, the notice issued by the Association contains specific financial information concerning union activities. *Cf. Hudson*, 475 U.S. at 307, 106 S.Ct. 1066; *Hohe*, 956 F.2d at 410; *Gillespie v. Willard City Bd. of Educ.*, 700 F.Supp. 898, 902–03 (N.D.Ohio 1987). Indeed, the sixteen-page document provides a level of detail that likely exceeds the minimums identified in the *Hudson* footnote and, in all respects, appears to represent a credible effort by the Association to satisfy constitutional obligations.

■ But there is no good faith exception to the First Amendment in the *Hudson* context. For all of its detail relating to union *expenses*, the notice did not disclose the *revenues* to be generated by assessment of the fee on all employees. In failing to provide the constitutionally crucial link between fair share fee revenues and chargeable expenses, the notice failed to provide the information fundamentally necessary to allow nonunion employees "to gauge the propriety of the union's fee." *Hudson*, 475 U.S. at 306, 106 S.Ct. 1066. It thus did not adequately protect their rights to freedom of expression. *Id.; Hohe*, 956 F.2d at 410; *Gillespie*, 700 F.Supp. at 902–03.

The notice provided by the union on March 15, 2003, failed in the central purpose of *Hudson* and must be deemed inadequate as a matter of law. Summary judgment will be granted in favor of plaintiffs on the unconstitutionality of the fair share fee assessment based on that notice.

An appropriate order will issue.

### ORDER

AND NOW, this 4th day of February, 2005, upon consideration of the cross-motions for summary judgment (Docs.42, 44), and for the reasons set forth in the accom-

---

**19.** Counsel for the parties conceded this during oral argument on the cross-motions (Doc. 68). *See also* FED. R. CIV. P. 56(d) (stating that court may determine what facts are in controversy by "interrogating counsel" at the hearing on a motion for summary judgment).

**20.** The court respectfully disagrees with *Fell v. Independent Association of Continental Pilots*, 26 F.Supp.2d 1272 (D.Colo.1998), in which the district court suggests that revenue generated by the fair share fee, as applied to all employees, is "irrelevant." *Id.* at 1281. To the contrary, such information is essential to allow potential objectors to make a knowledgeable objection to the fee. *See Hudson*, 475 U.S. at 307, 106 S.Ct. 1066. Just as a union may not transfer funds to a national

affiliation without showing that the funds will be used only for non-ideological activities, *see id.* at 307 n. 18, 106 S.Ct. 1066, a union may not "save" a portion of fair share fees without establishing that the funds will be used only for permissible activities. *See Wessel*, 327 F.Supp.2d at 1338–40. Unless the union discloses the revenues to be generated by the fair share fee—if applied to all employees—nonunion employees cannot reasonably determine whether the fee exceeds their *pro rata* share of collective bargaining expenses. *See Lehnert*, 500 U.S. at 524, 111 S.Ct. 1950; *Abood*, 431 U.S. at 225–26, 231, 97 S.Ct. 1782; *Wessel*, 327 F.Supp.2d at 1338–40; *see also supra* note 7 and accompanying text.

panying memorandum, it is hereby OR-DERED that:

1. Plaintiffs' motion for partial summary judgment (Doc. 42) is GRANTED.

2. Defendants' motion for summary judgment (Doc. 44) is DENIED.

3. The Clerk of Court is directed to defer the entry of judgment until the conclusion of this case.